USBC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/31/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ZAMA CAPITAL ADVISORS LP and ZAMA
CAPITAL STRATEGY ADVISORS LP,

                          Plaintiffs,

                -against-

UNIVERSAL ENTERTAINMENT
CORPORATION, UE RESORTS
INTERNATIONAL, INC. f/k/a OKADA MANILA
INTERNATIONAL, INC., TIGER RESORT ASIA
LIMITED, TIGER RESORT, LEISURE AND
ENTERTAINMENT, INC., and BYRON YIP,

                          Defendants.

---

1:24-cv-01577-MKV

**OPINION AND ORDER
GRANTING IN PART AND
DENYING IN PART MOTION TO
DISMISS FIRST AMENDED
COMPLAINT**

---

MARY KAY VYSKOCIL, United States District Judge:

       This case is the latest in a series of litigations between and among various parties in the

United States regarding a failed Special Purpose Acquisition Company ("SPAC"). Plaintiffs Zama

Capital Advisors LP ("Zama Capital Advisors") and Zama Capital Strategy Advisors LP ("Zama

Capital Strategy," together with Zama Capital Advisors, "Plaintiffs" or "Zama") bring this action

against Universal Entertainment Corp. ("UEC"), UE Resorts International, Inc. f/k/a Okada Manila

International, Inc. ("UERI"), Tiger Resort Asia Limited ("TRA"), and Tiger Resort, Leisure and

Entertainment, Inc. ("TRLEI" and together with "UEC," "UERI," and "TRA," the "UEC

Defendants" or "Defendants"), and Byron Yip.[1] Both the operative Amended Complaint ("FAC"

or "Amended Complaint") and pending Motion to Dismiss briefing reflect an acrimonious

relationship between the parties and are fraught with details irrelevant to the case at hand.

---

[1] The action was voluntarily dismissed against Hans Van Der Sande. [ECF No. 108]. Byron Yip has not been served
in this case.

Plaintiffs invoke the Court's diversity jurisdiction and assert claims for breach of contract, tortious interference, unjust enrichment, and fraud, and seek declaratory judgments in addition to monetary damages.  Plaintiffs allege that Defendants made fraudulent statements regarding the UEC business in connection with a prospective SPAC merger, and breached, or induced the breach, of two agreements associated with the prospective merger. Pending here is a motion to dismiss the operative Amended Complaint by Defendants UEC, UERI, TRA, and TRLEI for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, and for failure to state a claim pursuant to Rule 12(b)(6). The same defendants alternatively move to strike certain allegations from the FAC under Rule 12(f) as immaterial, impertinent, and scandalous.  The parties also filed several motions to seal material in the Amended Complaint and the motion to dismiss briefing.

For the reasons that follow, the Motion by Defendants UEC, UERI, TRA, and TRLEI to Dismiss is GRANTED IN PART AND DENIED IN PART.

## FACTUAL BACKGROUND[2]

### I.    Zama's Initial Investment In UEC

Zama is an investment management firm based in New York. FAC ¶ 41. UEC is a Japanese, publicly listed gaming company, which built the Okada Manila Casino. *Id*. ¶ 16, 26. Defendants TRA, TRLEI, and UERI (f/k/a OMI) are subsidiaries of UEC. *Id*. ¶¶ 3, 10.  Byron Yip is the is the President of Okada Manila Casino and Hans Van Der Sande is the financial advisor of UEC and the CFO and Treasurer of TRLEI and UERI. *Id*. ¶¶ 59, 78, 122 n.26.

UEC was one of Zama's first investments. *Id*. ¶ 44. In 2017, Zama invested in UEC because it theorized that UEC was undervalued based on its lack of visibility to investors and its history of

---

[2] The facts as stated herein are based on Plaintiffs' allegations in the Amended Complaint, *see* [ECF No. 43 ("FAC")], and are accepted as true for the purposes of the pending motions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

bribery and corruption its association with founder and former board member, Kazuo Okada. *Id.* ¶ 45. Zama believed that if UEC were able to remedy both issues, the price of UEC stock would increase. *Id.* Zama also believed, based on several public statements made by UEC, that since the removal of Mr. Okada, UEC was taking steps to resolve its corporate governance issues. *Id.* ¶ 36, 48-52. After Zama had invested in UEC, the company's investor relations department also emphasized to Zama UEC's commitment to enhanced corporate governance and compliance initiatives. *Id.* ¶ 53.

## II. The Note Purchase Agreement

In November 2018, Zama learned through an S&P ratings report that UEC was planning a 30 billion yen bond issuance and communicated with UEC representatives to demonstrate Zama's interest in the offering. *Id.* ¶ 60. Union Gaming, financial advisor to UEC in connection with the bond offering, sent Zama offering materials, including a draft note purchase agreement and an offering memorandum. *Id.* ¶¶ 60-61. The draft note purchase agreement included the following representations: (a) UEC and its subsidiaries were at the time, and would continue to be, in compliance with all applicable U.S. Economic Sanctions Laws, Anti-Money Laundering Laws and Anti-Corruption Laws, and (b) no proceeds from the sale of the notes would be used to make any "improper payments, including bribes, to any Government Official." *Id.* ¶ 61. UEC did not accept Zama's request to participate in the bond offering because its order size was deemed to be too small. *Id.* ¶ 63.

Though Zama makes no representations that it had reviewed the final Note Purchase Agreement at the time, Zama was "impressed by the breadth of representations and warranties that UEC had made to its bondholders about its compliance with laws and improved corporate governance." *Id.* ¶ 71. In reliance upon UEC's representations in connection with the note

issuance, from December 2018 to present, Zama more than doubled its investment in UEC to approximately $4 million—increasing its position from 63,200 shares to 144,100 shares of UEC stock. *Id.* ¶ 72.

## III.    The First Engagement Letter

After learning that UEC planned to take Okada Manila Casino public, Zama suggested listing it on a U.S.-based exchange, which Zama believed would double the value of UEC shares and help rehabilitate UEC's reputation. *Id.* ¶¶ 75-79, 80-81, 83. UEC and its then-President Jun Fujimoto supported this idea. *Id.* ¶ 81. Zama Capital Advisors and UEC thereafter entered into an agreement that Zama would help UEC find a SPAC partner, which would facilitate the public offering of the Okada Manila Casino. *Id.* ¶¶ 98-107, 335; *see also* Ex. 2 to the Declaration of Grant R. Mainland in Support of the Motion to Dismiss ("Mainland Decl.")  ("First Engagement Letter").[3] Zama agreed to accept zero fees from UEC for its services under the First Engagement Letter. *Id.* ¶¶ 103. When questioned by UEC at the time about the lack of fee, Zama stated that "we might want to participate in the SPAC deal." FAC ¶¶ 103-04, Ex. B (Takeuchi Aff.) ¶ 26. The Engagement Letter included a waiver of any fiduciary duties to UEC, a provision indemnifying Zama for certain losses arising from the engagement,[4]  and a forum selection clause identifying

---

[3] The Court finds that the First and Second Engagement Letters are incorporated by reference into the Amended Complaint because it 'makes a clear, definite and substantial reference to [both]." *Hagan v. City of New York*, 39 F. Supp. 3d 481, 494 (S.D.N.Y. 2014).

[4] The First Engagement Letter states that "[UEC] agrees to indemnify Zama as provided in Annex A hereto, the terms of which are incorporated into this agreement in their entirety." First Engagement Letter at 2.  Annex A provides that: "[UEC] agrees that it will indemnify and hold harmless Zama and its affiliates and their respective directors, officers, agents and employees . . . (each, an 'Indemnified Party'), to the full extent lawful, from and against any losses, expenses, claims or proceedings including shareholder actions (collectively, 'Losses') . . . related to or arising out of the Engagement or any Transaction or conduct in connection therewith, except that this clause [] shall not apply with respect to any Losses to the extent such Losses are finally judicially determined to have resulted from the gross negligence or willful misconduct of such Indemnified Party ("Uncovered Losses") . . . [UEC] will also promptly reimburse each Indemnified Party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred by such Indemnified Party in connection with investigating, preparing for, defending, or providing evidence in, any pending or threatened claim or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Zama or any Indemnified Party is a party to such claim or proceeding) or in enforcing this Annex."

4

New York as the forum for any "proceeding arising out of or relating to" the engagement letter. *Id.* ¶¶ 15, 107; see also Mainland Dec., Ex. 2 at 1-2, 4. In agreeing to enter into the First Engagement Letter, Zama relied on representations by UEC that the company had stopped engaging in illegal bribery and corruption. Id. ¶ 108.

After execution of the First Engagement Letter, Zama searched for potential SPAC partners by reaching out to investment banks and its own network for referrals, and began discussions with Jason Ader, who owned SPAC 26 Capital. *Id.* ¶¶ 112, 114. As discussions progressed, Zama agreed to invest $4.5 million to purchase a pro rata economic interest in 26 Capital and another $4 million to acquire interest in another SPAC sponsor vehicle. *Id.* ¶¶ 118-19. Zama's investment in 26 Capital was not contingent on any deal being consummated and gave it no ability to direct or influence the management of the sponsor or the SPAC. *Id.* ¶ 118.

## IV.    The Merger Agreement

After an introduction from Zama, UEC agreed to proceed with a transaction with 26 Capital. *Id.* ¶¶ 120-21. Over the next several months, in 2021 UEC negotiated a merger agreement with 26 Capital. *Id.* ¶¶ 122-42. Zama did not act as UEC's negotiator in connection with the negotiations, but it did help coordinate meetings and attended those meetings for coordination purposes. *Id.* ¶ 123-25. Zama also "shared its perspective regarding the proposed merger agreement with both UEC and 26 Capital." *Id.* ¶ 128. At the close of negotiations, on October 15, 2021, 26 Capital and "certain UEC affiliates" signed a merger agreement whereby UERI would

---

The indemnification clause states: "[UEC] will indemnify and hold harmless Zama and its affiliates … (each, an 'Indemnified Party'), to the full extent lawful, from and against any losses, expenses, claims or proceedings including shareholder actions (collectively, "Losses") (i) related to or arising out of (A) the contents of oral or written information provided by Zama, its affiliates and their respective employees or its other agents, which information either the Company, Zama or their respective affiliates provide to any SPACs or their affiliates or (B) any other action or failure to act by Zama, its affiliates and their respective employees or its other agents or by Zama or any Indemnified Party in accordance with and at the Company's request or with the Company's consent, or (ii) otherwise related to or arising out of the Engagement or any Transaction or conduct in connection therewith. *Id.* ¶ 107.

merge with 26 Capital and become a publicly-list company on the Nasdaq. *Id.* ¶ 142. In the Merger Agreement, UEC represented and warranted that "any directors or officer acting for or on behalf of the Company, currently complies, and since the Lookback Date has complied, in all material respects with all applicable Anti-Corruption Laws and Anti-Money Laundering Laws." *Id.*

In connection with the Merger Agreement, TRA, OMI, and 26 Capital also agreed to a Registration Rights Agreement ("RRA"), which would become fully effective upon the closing of the SPAC transaction between 26 Capital Acquisition Corporation and Defendants. *Id.* at 142 n.29.

## V.    The Second Engagement Letter

Following the execution of the Merger Agreement, in October 2021, UEC asked Plaintiffs to sign a second contract for Zama to provide consulting services, including input on management compensation for UERI. *Id.* ¶¶ 146-47. The Second Engagement Letter was executed by Zama Capital Strategy and UEC. *Id.* ¶ 150.  In the Second Engagement Letter, Zama Capital Strategy agreed to "provide strategy and business consulting services [for UEC,] including services related to a combination of Okada Manila International, Inc. ("OMI") with 26 Capital Acquisition Corp." FAC ¶ 159; *see also* Mainland Decl., Ex. 5 at 1 (the "Second Engagement Letter"). The Second Engagement Letter also contained the following: (1) an indemnification provision, *id.* ¶ 158; (2) an agreement by UEC also to pay Zama Capital Strategy $2.5 million upon signing of the contract and another $7.5 million when the UERI achieved a public listing on a U.S.-based exchange, *id.* ¶ 152; (3) a waiver of fiduciary duties; (4) an agreement that UEC was not relying on advice from Zama related to the merger or otherwise; (5) an agreement that Zama would not have to restrict its investing activities in any way; and (6) an agreement that Zama had no duty to disclose any of its investing activities, *id.* ¶ 157. The Second Engagement Letter also included a forum selection clause identifying New York as the forum for any "proceeding arising out of or relating to" the

engagement letter. *Id.* ¶¶ 15, 107. In agreeing to the Second Engagement Letter, Zama relied on

UEC's prior representations, including those UEC made in the Merger Agreement itself, that the

UEC Defendants had stopped engaging in illegal bribery and corruption. *Id.* ¶ 159. Pursuant to the

Second Engagement Letter, Zama collaborated with UEC Defendant officials and attorneys to

create an equity compensation proposal for executives. *Id.* ¶ 163.

## VI. Bribery Continues at UEC and Subsidiaries

In fact, in as recently as 2020, a then-member of UEC board of directors, Hajime Tokuda

(now UEC's President), had conversations with another senior official, regarding the Okada

Manila Casino overpaying a law firm assisting with a tax refund with the understanding that the

extra payment would be use to pay bribes to local tax authorities. FAC ¶ 73. Neither UEC nor

Okada Manila Casino made any improvements to governance following the ouster of Kazuo

Okada. *Id.* ¶ 56. UEC's directors and officers and the Okada Manila's senior executives continued

to engage in bribery and other illegal actions. *Id.* Later on, in 2022, the Okada Manila Casino

signed a contract with a vendor named Master Gogger, a cleaning and pest control company, for

which no services were rendered. *Id.* ¶ 187-89. On information and belief, the contract was a way

in which senior executives at UEC embezzled money from the company. *Id.* ¶ 189. Under the

contract, UEC allegedly made a $2.5 million payment, which dwarfed the $145,000 price Okada

Manila Casino paid to another pest control vendor under a separate contract. *Id.* ¶ 190.  This

contract resulted in criminal charges that were later dropped.  *Id.* ¶ 187 n.35. In April 2024, a

Tokyo High Court held that former UEC President Fujimoto embezzled approximately $43.5

million of UEC's money for his own benefit. *Id.* ¶ 325.

## VII.    Negotiation of the SPAC Merger

Internal disputes erupted among the UEC Defendants over the post-merger management of the Okada Manila Casino, including regarding the role and compensation of Van Der Sande, Yip, and other executives. *Id*. ¶¶ 164, 167-76, 184, 192-197. In addition, UEC started to explore alternate transactions to the SPAC and, in considering alternative transactions, Fujimoto, president of UEC, repeatedly expressed the desire to delay the SPAC merger. Id. ¶¶ 177-80, 183.  Van Der Sande wrote to Zama that he believed such a delay of the SPAC merger or entering into an alternate transaction would breach the Merger Agreement. *Id.* ¶¶ 180, 182.

## VIII.   UEC Loses Control Of The Casino To Kazuo Okada

During negotiation of the SPAC merger, on April 27, 2022, the Philippine Supreme Court issued an order that directed the Okada Manila Casino, "to observe the status quo prevailing prior to the removal of [Kazuo Okada] as stockholder, director, chairman, and CEO [] in 2017," (the "Status Quo Order"). *Id.* ¶ ¶ 198-201. Then, on May 2, 2022, an armed group loyal to Okada arrived at the Okada Manila Casino in person and demanded control but were refused. *Id.* ¶ 204. During this period, Defendants delayed sharing with Zama or 26 Capital details concerning the Status Quo Order or Okada's demands.  *Id.* ¶¶ 205-07. All parties agreed that the Status Quo Order needed to be disclosed as a new risk factor to be included in the Form F-4 to be filed with the SEC. *Id.* ¶ 207. Within a month of the Status Quo Order, platoon of local police and two of Kazuo Okada's "lieutenants" gained physical control of the Okada Manila Casino. *Id.* ¶ 223. Subsequently, the UEC board voted to extend the Merger Agreement. *Id.* ¶¶ 231-235.

## IX.    Defendants Regain Control Of The Casino and
##         Decide To Terminate The SPAC Transaction

After UEC lost control of the Okada Manila Casino, it attempted to regain control. *See* generally id. ¶¶ 237-51. In June 2022, Michelle Lazaro, who is a director and Corporate Secretary

of the Okada Manila Casino, sent an email to senior UEC officials stating that UEC Director and Head of Foreign Operations Hajime Tokuda (who is now President of UEC) and Okada Manila Casino Vice Chairman Michiaki Satate were "trying to develop a relationship with the most senior people in the Philippines, one of whom is a common friend of James and me." *Id.* ¶ 238. This "common friend" referred to in Lazaro's email was Martin Romualdez, the Speaker of the Philippines' House of Representatives. *Id.* ¶ 239. Lazaro also threatened UEC, saying that while "our common friend … is the best option to lead UEC out of this current disturbing situation," he "feels that my involvement moving forward is indispensable and he has requested my full cooperation and support … [and] is reluctant to provide further assistance or to pursue any potential partnership with [UEC] unless my concerns are addressed." *Id.* ¶¶ 238-39. UEC's management quickly acceded to Lazaro's demands, paying her a monthly fee and giving her power over the executives of the Okada Manila Casino. Id. ¶ 240. Through Lazaro, Van Der Sande and Yip also obtained employment security and an increase in compensation. *Id.* ¶ 241.

In July 2022, UEC delivered "heavy luggage" filled with highly valuable Japanese ceramics to Romualdez and gave him an equity stake in a company controlled by UEC which owns the land upon which the Okada Manila Casino sits. Id. ¶¶ 242-46. After the ceramics were given to Romualdez, he called Philippines Supreme Court Justices to try to influence their decision making. Id. ¶¶ 245. UEC also paid $5 million directly to Supreme Court and appellate court justices. *Id.* ¶¶ 248-49. On August 9, 2022, the Philippine Supreme Court remanded the Status Quo Order case to the Court of Appeals. *Id.* ¶ 253. On September 2, 2022, UEC took back control of the Okada Manila Casino with the assistance of the Philippine Department of Justice and The Philippine Amusement and Gaming Corporation ("PAGCOR"). *Id.* ¶¶ 250 & 254. UEC also made payments to PAGCOR. *Id.* ¶ 250.

Plaintiffs allege that after regaining control of the casino various officials at the UEC Defendants purposefully delayed the SPAC merger from closing based on fear that the United States regulatory and criminal system would create risk for senior executives. *Id.* ¶¶ 263-309. For instance, Van Der Sande and Yip delayed providing materials to UHY, the auditor for the deal. *Id.* ¶¶ 214, 263-309. Van Der Sande and Yip separately coerced UHY into stating that Zama improperly shared information with a third-party preparing financial statements for Okada Manila Casino. *Id.* ¶¶ 298-302. In fact, an official at UEC stated to Zama and 26 Capital that the CFO and president of UEC, Fujimoto as well as Van Der Sande had been planning to terminate the SPAC deal since at least August 2022. *Id.* ¶ 263.

Further, Van Der Sande and Yip believed that senior leadership of UEC, including Fujimoto, could be convinced not to extend the merger timeline because they would be a "receptive audience" to the warning that becoming subject to United States regulatory and criminal schemes would create immense risk for these senior executives who approved of, undertook, and engaged in bribery and other illegal acts. *Id.* ¶ 268. Van Der Sande and Yip planned to "scare UEC" out of the SPAC merger by claiming that 26 Capital would face a high level of redemptions and be delisted. *Id.* ¶ 268. The UEC board did decline to approve an extension of the merger timeline, and later approved an extension subject to an amendment. *Id.* ¶¶ 214, 263-309. Zama continued to attempt to complete the deal, flying to Tokyo once to meet with UEC officials. *Id.* ¶¶ 274-75. The merger did not close and UERI was not publicly listed on a U.S. exchange. *Id.* ¶¶ 309-310.[5]

---

[5] The Amended Complaint occasionally refers generally to the "listing of OMI [or Okada Manila Casino] on a US-based exchange." *See* FAC ¶¶ 310, 353, 392. But the Amended Complaint also explains that UERI was formerly known as Okada Manila International, Inc. or ("OMI") and that the Merger Agreement anticipated that "UERI would merge with 26 Capital and become a publicly-listed company on the Nasdaq." *See* FAC ¶¶ 3, 142. Accordingly, in this opinion the Court consistently refers to the parties' plan to list UERI on the Nasdaq.

## X.  26 Capital Sues In Delaware and UEC Defendants Sue in New York

26 Capital filed suit in Delaware to seek an order of specific performance forcing the UEC Defendants to close the SPAC transaction (the "Delaware Litigation"). *Id.* ¶ 310. Zama was not a party in this Delaware Litigation. *Id.* ¶ 319. The court held that the SPAC was not entitled to specific performance and deferred judgment on damages. *Id.* ¶ 310. Zama Capital Advisors and Zama Capital Strategy were both subpoenaed in the lawsuit and UEC has refused to reimburse Plaintiffs for related legal fees or the millions of dollars that Zama has otherwise spent on litigation related to the failed SPAC deal. *Id.* ¶ 318. UEC thereafter purportedly settled with 26 Capital. *Id.* at 5. The business day following the purported settlement of the Delaware litigation, the Philippines Supreme Court Justices that UE had bribed lifted the SQ Order. *Id.* ¶ 312.

Thereafter, UEC sued Zama and its principal in the United State District Court for the Southern District of New York. *Id.* ¶ 329. Zama moved to dismiss the complaint and during discovery UEC voluntarily dismissed the case against Zama. *Id.* ¶ 332-33.

## **PROCEDURAL HISTORY**

Zama commenced this action initially by filing a Complaint under seal, but thereafter a redacted complaint was filed on the docket.[6]  [ECF No. 12].  In response to a pre-motion conference letter in connection with an anticipated motion to dismiss, or, in the alternative, to strike certain allegations in the complaint, Plaintiffs filed a letter advising that they intended to amend their complaint, and soon thereafter filed the operative First Amended Complaint. [ECF Nos. 36, 41, 43 (the "Amended Complaint" or "FAC"), 44].

---

[6] The Complaint was filed under seal pursuant to leave temporarily granted by the Part One Judge.  Thereafter, Defendant UEC filed a letter motion requesting that the Court extend sealing as to only certain allegations in the Complaint, and attached a proposed redacted Complaint.  [ECF No. 26 (the "March 11 Letter")].  Plaintiffs' opposed Defendants motion to seal in its entirety, requested that the Court unseal the action and convert it into an electronic filing matter and order that the Complaint remain under seal pending the resolution of the March 11 letter. [ECF No. 27 & 39]. The request was granted, the action was converted it into an electronic filing matter and the docket was unsealed with the redacted complaint was filed on the docket. [ECF No. 12].

UEC Defendants moved to dismiss the Amended Complaint, or in the alternative strike certain allegations therein, filing in support a memorandum of law and a Declaration of Grant R. Mainland which attached several exhibits. [ECF Nos. 53 ("Mot."), 54 ("Def. Mem."), 55 ("Mainland Decl.")]. Defendants Plaintiffs filed an opposition to the motion to dismiss [ECF No. 68 ("Pl. Opp.")], and a Declaration of Donald Reinhard, accompanied by several exhibits [ECF No. 69 ("Reinhard Decl.")]. Defendants filed a reply brief in further support of their motion. [ECF No. 76 ("Def. Reply")]. Subsequently, Hans Van Der Sande filed two motions to dismiss, along with two motions to seal the associated briefing. [ECF Nos. 72, 97, 75, and 103]. Later, Van Der Sande was voluntarily dismissed from the case and his pending motions to dismiss were denied as moot. [ECF Nos. 108, 109].

UEC Defendants and Plaintiffs filed motions to seal certain motion to dismiss briefing. [ECF Nos. 56 & 67].  The UEC Defendants filed a letter thereafter advising the court of a ruling in *26 Capital Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 439 (Del. Ch. 2023). [ECF No. 110].

The Court heard oral argument regarding the UEC Defendants' motion to dismiss on February 6, 2025. [ECF No. 119 ("Tr.")].

## **LEGAL STANDARDS**

### I.    **Federal Rule of Civil Procedure 12(b)(1) – Lack of Standing**

Defendants do not move to dismiss for lack of Article III standing pursuant to Federal Rule of Civil Procedure 12(b)(1), although they do argue briefly that Plaintiffs lack standing as to part of Plaintiffs' fraud claim. *See* Mot. at 1; Def. Mem. at 32-33. Nevertheless, this Court is constitutionally limited to resolving "Cases or Controversies," so it is "entitled at any time *sua sponte* to delve into the issue of standing even if defendants do not raise the issue". *See Green*

12

*Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021) (quotation marks omitted) (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 108 (2d Cir. 1997)) (. The Court does so here.

Dismissal of an action under Rule 12(b)(1) is warranted whenever a district court "'lacks the statutory or constitutional power to adjudicate it,' such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d. Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). A plaintiff bears the burden of establishing its standing by a preponderance of the evidence. *See Makarova*, 201 F.3d at 113. "In assessing the plaintiff's assertion of standing, '[courts] accept as true all material allegations of the complaint[ ] and . . . construe the complaint in favor of the complaining party.'" *Cortlandt St. Recovery*, 790 F.3d at 417 (quoting *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008)). Courts may also consider evidence outside of the pleadings in assessing a Rule 12(b)(1) standing motion. *Cortlandt St. Recovery*, 790 F.3d at 417; *Makarova*, 201 F.3d at 113.

## II.    Federal Rule of Civil Procedure 12(b)(2) – Lack of Personal Jurisdiction

Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss the Amended Complaint for lack of personal jurisdiction. "On a Rule 12(b)(2) motion, plaintiff carries the burden of demonstrating that jurisdiction exists, and where the district court did not conduct a full-blown evidentiary hearing on a motion, the plaintiff need make only a *prima facie* showing of jurisdiction." *Penachio v. Benedict*, 461 F. App'x 4, 5 (2d Cir. 2012); *see also In re Terrorist Attacks*, 714 F.3d 659, 673 (2d Cir. 2013). At the pleading stage, a plaintiff may make a *prima facie* showing by relying on its pleadings and affidavits, and a showing of personal jurisdiction

13

may be established solely by allegations. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013). However, to adequately allege personal jurisdiction, a plaintiff "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* at 85; *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (A *prima facie* showing of personal jurisdiction may be made through the plaintiff's "own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant."). In assessing jurisdiction on a 12(b)(2) motion, the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs." *Id.*

It is well settled that, in deciding a motion to dismiss a complaint for want of personal jurisdiction, the Court may consider materials outside the pleadings. *Fleming v. ISCO Indus., Inc.*, 750 F. App'x 62, 63–64 (2d Cir. 2019) (citing *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) ("[W]e have made clear that a district court may [consider materials outside the pleadings] without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment.")). Accordingly, facts asserted in both a complaint and opposition to a motion to dismiss "are assumed to be true." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 728 (2d Cir. 2012) (citing *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 56–57 (2d Cir.1985)). Still, the Court cannot "draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *O'Neill v. Asat Trust Reg.*, 714 F.3d 659, 673 (2d Cir. 2013). If the Court lacks personal jurisdiction over a defendant, the claims against that defendant must be dismissed.

There are three traditional bases for the exercise of personal jurisdiction over a defendant. First, a court may exercise general jurisdiction over a defendant that is "essentially at home in the

forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014).  Second, a court may exercise "specific or conduct-linked jurisdiction" where there is a sufficient link between the defendant's conduct in the forum and the conduct at issue in the case.  S*onera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014).  Third, a defendant can consent to the exercise of personal jurisdiction.  *See J. McIntyre Mach., Ltd. v. Nicasto*, 564 U.S. 873, 880 (2011) (plurality opinion); *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006).  In all cases, the exercise of jurisdiction over a defendant must comport with notions of due process. *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). Plaintiffs here assert that Defendants consented to jurisdiction and that there is also specific jurisdiction over Defendants.

## III.    Federal Rule of Civil Procedure 12(B)(6) – Failure to State a Claim

Defendants also move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted.  On this motion, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  *Does 1-2 v. Hochul*, No. 22-2858, 2024 WL 5182675, at *1 (2d Cir. Dec. 20, 2024). On a Rule 12(b)(6) motion, the issue is not whether the plaintiff will ultimately prevail, but whether his claim, as pleaded, is sufficient to afford him the opportunity to proceed on the evidence.  *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678.  While the Court "must accept as true all of the allegations contained in a complaint," this "tenet . . . is inapplicable to legal conclusions."  *Id.*

The "plausibility standard" articulated in *Iqbal* "is not akin to a 'probability requirement,' but it "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  At bottom, Plaintiff must "nudg[e] [his] claim[] across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 569.  Otherwise, the complaint must be dismissed.  *Id.*

"[O]n a motion to dismiss, a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference," "matters of which judicial notice may be taken," and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (internal quotation marks omitted) (quoting *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see Tellabs*, 551 U.S. at 322. "A document is incorporated by reference if the complaint 'makes a clear, definite and substantial reference to [it],'" *Hagan v. City of New York*, 39 F. Supp. 3d 481, 494 (S.D.N.Y. 2014) (quoting *Helprin v. Harcourt, Inc.,* 277 F. Supp. 2d 327, 330–31 (S.D.N.Y.2003). However, on a motion to dismiss for failure to state a claim, unlike a motion to dismiss for lack of personal jurisdiction, a plaintiff may not raise new facts in opposing dismissal and ask the Court to rely on those facts in determining whether he or she has stated a claim. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 540 (S.D.N.Y. 2021), *judgment entered,* No. 19cv3356 (JPC), 2021 WL 5140777 (S.D.N.Y. Nov. 4, 2021) (citing *Wright v. Ernst & Young*

*LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (noting that a plaintiff cannot "amend" its pleading through

its opposition papers)) and citing *In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*, No.

14 Civ. 4471 (KMW), 2016 WL 922711, at *5 n.9 (S.D.N.Y. Mar. 7, 2016) ("Plaintiffs, likely

realizing the weaknesses in the Complaint, attempt to improperly plead new facts in

their Opposition to the Motion to Dismiss. The Court does not consider these allegations because

they were not part of the Complaint.") and citing *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp.

2d 432, 445 n.100 (S.D.N.Y. 2005) ("[N]one of these new facts appear in the Complaint, which

cannot be amended by the brief in opposition to a motion to dismiss.")).

## IV.    Federal Rule of Civil Procedure 12(f) – Motion to Strike

"The court may strike from a pleading . . . any redundant, immaterial, impertinent, or

scandalous matter." Fed. R. Civ. P. 12(f). In general, "motions to strike are disfavored." *Ambac

Assur. Corp. v. EMC Mortg. Corp.*, No. 08 Civ. 9464 (RMB) (MHD), 2009 WL 734073, at *1

(S.D.N.Y. Mar. 16, 2009) (quoting *Roe v. City of N.Y.*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)).

"Where a demand for damages is not recoverable as a matter of law, however, it may be stricken."

*Phila. Stock Exch. v. Int'l Sec. Exch., Inc.*, No. 05 Civ. 5390, 2005 WL 2923519, at *1 (S.D.N.Y.

Nov. 2, 2005). The Court will "deem the non-moving party's well-pleaded facts to be admitted,

draw all reasonable inferences in the pleader's favor, and resolve all doubts in favor of denying

the motion to strike." *Diesel Props S.r.L. v. Greystone Bus. Credit II LLC*, No. 07 Civ. 9580, 2008

WL 4833001, at *4 (S.D.N.Y. Nov. 5, 2008); *see also Lipsky v. Commonwealth United Corp.*, 551

F.2d 887, 893 (2d Cir. 1976).

## DISCUSSION

Plaintiffs bring nine claims: 1) a claim against UEC for breach of the First Engagement

Letter, FAC ¶334-42 ("Count One"); 2) a claim against UEC for breach of the Second Engagement

Letter, FAC ¶343-56 ("Count Two"); 3) a claim seeking declaratory judgment against UEC regarding the First Engagement Letter, FAC ¶357-65 ("Count Three"); 4) a claim seeking declaratory judgment against UEC regarding the Second Engagement Letter, FAC ¶366-74 ("Count Four"); 5) a claim against TRLEI and Byron Yip for tortious interference with the First Engagement Letter, FAC ¶ 375-81 ("Count Five"); 6) a claim against TRLEI and Byron Yip for tortious interference with the Second Engagement Letter, FAC ¶ 382-88 ("Count Six"); 7) a claim against UEC for unjust enrichment, FAC ¶ 389-95 ("Count Seven"); 8) a claim against TRA and UERI for breach of the Registration Rights Agreement, FAC ¶396-404 ("Count Eight"); and 9) a claim against UEC, TRLEI, TRA, and UERI for fraud, FAC ¶405-13 ("Count Nine").

UEC contends that it is not subject to personal jurisdiction in New York as to the fraud claim. Def. Mem. at 27-34. TRA, TRLEI, and UERI contend that they are not subject to personal jurisdiction in New York for any claims. *Id.* at 34-40. Because personal jurisdiction is a threshold issue, the Court's analysis begins there before addressing Plaintiffs' substantive claims. *See Basile v. Walt Disney Co.*, 717 F. Supp. 2d 381, 385 (S.D.N.Y. 2010) ("[V]enue and personal jurisdiction are threshold procedural issues to be decided before the substantive grounds in a motion to dismiss.").

## I.    Personal Jurisdiction

It is not disputed that all defendants here are foreign corporations. Defendant UEC is a publicly-listed Japanese corporation with its principal place of business in Tokyo. FAC ¶ 3. Defendant TRA is a private company both incorporated, and having its principal place of business in, Hong Kong. FAC ¶ 4.  Defendants TRLEI and UERI both have their principal place of business in Manila, Philippines. FAC ¶¶ 5, 6. Nevertheless, Plaintiffs establish a *prima facie* case that UEC, UERI and TRLEI consented to personal jurisdiction in New York. Plaintiffs fail to allege that this Court has personal jurisdiction over TRA.

**A.**    **UEC Consented to Jurisdiction in New York**

Plaintiffs do not allege that UEC is subject to general jurisdiction. Instead, they plead that this Court may exercise personal jurisdiction over UEC based on its agreement to the First and Second Engagement Letters. FAC ¶ 10. Under the First and Second Engagement Letters, the parties agreed to "submit to the exclusive jurisdiction of the federal or state courts located in the County of New York, State of New York in any proceeding arising out of or relating to" the respective engagement letters. FAC ¶ 15. Defendants concede that UEC is subject to personal jurisdiction pursuant to the forum selection clauses in the engagement letters for all claims other than Plaintiffs' fraud claim. Def. Mem. at 34-35.[7]

The scope of forum selection clauses are not limited solely to claims for breach of the contract in which they are contained. *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.1993). Whether a forum selection clause encompasses other claims depends principally on how broadly the clauses are worded. *See id.* at 1361.

Plaintiffs argue that the fraud claim here is within the scope of the forum selection clauses in the engagement letters because the fraud claim "involve[s] the same operative facts as a parallel claim for breach of contract." Pl. Opp. at 37-38 (citing *Cfirstclass Corp. v. Silverject PLC*, 560 F. Supp. 324, 329 ("a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend on the existence of a contractual relationship between the parties, or … involve the same operative facts as a parallel claim for breach of contract.") and citing *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99cv10550 (SHS), 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000)).  Plaintiffs argue that the fraud claim here involves the "same operative facts" as

---

[7] The Court notes that Plaintiffs assert that "UEC entered into the First Engagement Letter with [only] Zama Capital Advisors LP" see ¶ 335, and UEC entered into the Second Engagement Letter with only Zama Capital Strategy. FAC ¶ 150-151.

the claims for breach of the engagement letters because the fraud claim alleges that Plaintiffs would not have entered the First and Second Engagement Letters but for UEC's fraud. Pl. Opp. 38 (citing FAC ¶¶ 108, 159, 411).

The facts underlying the fraud claim are not the same operative facts on which the breach of contract claims are premised. In fact, the breach of contract claims have nothing to do with UEC's alleged misrepresentations which Plaintiffs claim induced them to enter the contracts. Instead, the breach of contract claims are premised on the allegation that, *after* the contracts were executed, UEC failed to indemnify Zama for its losses, improperly reached a settlement related to or arising out of the two Engagement Letters, and maliciously prevented the successful listing of UERI on the Nasdaq, purposely preventing a condition precedent to Zama's payment under the Second Engagement Letter. FAC ¶¶ 339, 340, 348–354.

Still, the forum selection clauses at issue here consent to adjudicate in New York all claims "arising out of *or relating to*" the agreements. FAC ¶ 15 (emphasis added). Courts have recognized that provisions so worded are broad in scope. *New London Assocs. v. Kinetic Soc. LLC*, 384 F. Supp. 3d 392, 406 (S.D.N.Y. 2019) ("the phrase 'any claim or controversy arising out of or relating to the agreement' is 'the paradigm of a broad clause'"); *see also Coregis Ins. Co. v. American Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001). The phrase "related to" is generally broader than phrases "arising out of." *See In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 367 (S.D.N.Y.), on reconsideration in part, 813 F. Supp. 2d 383 (S.D.N.Y. 2011). In *Phillips v. Audio Active Ltd.*, the Second Circuit explained "[w]e do not understand the words 'arise out of' as encompassing all claims that have some possible relationship with the contract, including claims that may only "relate to," be "associated with," or "arise in connection with" the contract. 494 F.3d 378, 389 (2d Cir. 2007). Courts have described the term "relating to" as equivalent to the phrases

"in connection with" and "associated with," and synonymous with the phrases "with respect to," and "with reference to." *In re Optimal U.S. Litig.*, 813 F. Supp. 2d at 36.

Accordingly, the cases Plaintiffs cite—for the standard that claims are within the scope of a forum selection clause when they involve the "same operative facts as a parallel claim for breach of contract"—are inapposite because they involve forum selection clauses that are more narrowly worded than the clauses at issue here. For instance, the forum selection clause at issue in *Cfirstclass* applied to only "all disputes arising hereunder." *Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 329 (S.D.N.Y. 2008). Similarly, *Direct Mail* included a narrow clause: "THIS Agreement shall be governed by and construed in accordance with English law and the parties hereto agree that the English courts shall have exclusive jurisdiction." *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99 CIV. 10550 (SHS), 2000 WL 1277597, at *3 (S.D.N.Y. Sept. 7, 2000).

Courts in the Second Circuit "discount[] the precedential weight of cases that deal with dissimilarly worded clauses." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 390 (2d Cir. 2007) (citing *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997) (Alito, J.)). In other words, "[d]rawing analogy to other cases is useful only to the extent those other cases address contract language that is the same or substantially similar to that at issue." *John Wyeth & Brother Ltd.*, 119 F.3d at 1075.

Here, Zama alleges in its fraud claim that it "justifiably relied upon Defendants' material and false representations when (a) investing in UEC' directly, (b) agreeing to enter into and executing the First Engagement Letter, (c) agreeing to enter into and executing the Second Engagement Letter, (d) investing on the SPAC side of the proposed merger agreement with 26 Capital, and (e) performing services and expending significant time and funds in aid of closing the proposed SPAC merger and publicly listing [UERI] on a U.S. exchange." FAC ¶ 411. The fraud

claim against UEC clearly is "related to" Zama's decision to enter into both the first and second engagement letters and its subsequent performance pursuant to those letters. As such, UEC has consented to jurisdiction in New York for such a claim.[8]

**B.    Plaintiffs Establish a Prima Facie Case For Personal Jurisdiction over UERI and TRLEI but not TRA**

Plaintiffs similarly do not allege general jurisdiction against UERI, TRA, and TRLEI. Rather they argue: (1) all defendants consented to jurisdiction by filing a complaint in this district; (2) TRA and UERI specifically consented to personal jurisdiction through the Registration Rights Agreement; (3) UERI, TRA, and TRLEI each is so closely related to UEC that they consented to jurisdiction through UEC's signature of the Engagement Letters; and (4) that UERI, TRA, and TRLEI are subject to jurisdiction pursuant to New York's long-arm statute.  The Court addresses each of these theories separately, and concludes that this Court does have personal jurisdiction over UERI and TRLEI, but not TRA.

*i.    UEC, UERI, and TRLEI are Subject to Jurisdiction by Reason of their Prior Filing of a Complaint in This Court Embracing the Same Issues*

Plaintiffs allege that UEC, UERI, and TRLEI are subject to personal jurisdiction in New York because each filed claims against Plaintiffs in this Court in 2023, and in connection, with voluntarily dismissing those claims without prejudice, UEC, UERI, and TRLEI entered into a Tolling Agreement consenting to jurisdiction in New York. FAC ¶ 11.

As an initial matter, to the extent Plaintiff relies on the Tolling Agreement, the Plaintiffs do not allege any facts with respect to the agreement in the Amended Complaint, or otherwise suggest that the present suit "aris[es] out of or relat[es] to th[e] Tolling Agreement" so as to subject

---

[8] As further explained *infra* in § I(B)(i), UEC is also subject to jurisdiction over the claims here based on its filing of a prior related lawsuit.

the signatories to jurisdiction in this case. *See* Pl. Opp. at 43. Accordingly, neither UEC, UERI, nor TRLEI are subject to jurisdiction because they entered into to the Tolling Agreement.

Zama also claims that Defendants' use of this forum to litigate a prior suit subjects them to jurisdiction in this suit because the prior suit "arose out of and are related to the same Engagement Letters and transactions that Plaintiffs' claims in this action arise out of and relate of." *See* Pl. Opp. at 42-43 (citing FAC ¶¶ 329-33)..

As a general rule, "[a] party's consent to jurisdiction in one case [] extends to that case alone. It in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given, where the party does not consent and no other jurisdictional basis is available." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 n.5 (2d Cir. 1991). However, in the context of counterclaims, a plaintiff bringing suit in a forum "submits itself to the jurisdiction of the court with respect to all the issues embraced in the suit, including those pertaining to the counterclaim of the defendants." *V&A Collection, LLC v. Guzzini Properties Ltd.*, 46 F.4th 127, 132 (2d Cir. 2022) (quoting *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451, 52 S.Ct. 238, 76 L.Ed. 389 (1932)).

Plaintiffs cite to *V&A Collection*, contending that its claims here involve the same issues on which they were sued by Defendant in a prior action before this Court, and its claims here would have been compulsory counterclaims in the prior action, and thus Defendants have consented to jurisdiction in this action. *Id.* at 42–43. Plaintiffs overstate the holding in *V&A Collection* and the scope of the prior litigation.

In fact, in *V&A Collection* the Second Circuit specifically declined to adopt a rule adopted in the First Circuit, which subjects defendants to jurisdiction where they were plaintiffs in a prior, related action in the same forum. *See V&A Collection*, 46 F.4th at 132 ("The First Circuit [in

*Interpole*] has expanded that rule to extend consent jurisdiction to other lawsuits in the same forum arising out of the same transaction or occurrence . . . We [] need not decide whether to adopt *Interpole*, which would not apply here in any event.").[9] *V&A Collection* involved a dispute over the ownership of a piece of art. *Id.* at 131. The defendant in that case had earlier filed suit in a New York state court against a party that was not the Plaintiff regarding its ownership of a different piece of art. *Id.* The Second Circuit declined to reach the issue of whether to adopt the First Circuit rule because the prior action involved different parties and arose from different facts. *See id.* at 133; *see also Gulf Ins. Co. v. Caldor Corp.*, No. 03 CIV. 2894 (LLS), 2006 WL 1586571, at *4 (S.D.N.Y. June 9, 2006), *aff'd*, 273 F. App'x 90 (2d Cir. 2008) (declining to adopt the First Circuit rule because the parties in the subject action were not the same as in the prior action).

Here, however, the prior litigation through which Plaintiffs allege that Defendants consented to jurisdiction did involve the same transactions or occurrences and many of the same parties before the Court in this case.[10]  All parties here, except for TRA, were parties in the prior suit. *Universal Ent. Corp. v. Eiseman*, No. 23 Civ. 2250 (LGS), ECF No. 31, (S.D.N.Y. Apr. 21, 2023). The prior suit arises from the same failed SPAC merger and the attempt by UEC, TRLEI, and UERI to void the Engagement Letters at issue here. *Id.* However, the prior action did not involve the RRA at all. *Id.* As such, UERI, as a plaintiff in the prior suit and a purported party to the RRA, did not consent to jurisdiction over Plaintiffs' claim that it breached the RRA.  With

---

[9] Plaintiffs assert that "Courts in this and other Circuits have repeatedly" applied this rule. Pl. Opp. at 42. Plaintiffs cite to only one case from this Circuit supporting this statement. *Id.* at 42 (citing *Andros Compania Maritima, S.A. v. Intertanker Ltd.*, 718 F. Supp. 1215, 1217 (S.D.N.Y. 1989)). That case is clearly distinguishable. In *Andros Compania*, the prior and later actions were consolidated. 718 F. Supp. at 1217.  As such, the facts more closely reflect the situation described *supra*, in which a Plaintiff may not argue a lack of personal jurisdiction over counterclaims where it subjected itself to jurisdiction in the same suit. *See V&A Collection,* LLC, 46 F.4th at 132.

[10] The Court takes judicial notice of *Universal Ent. Corp. v. Eiseman*, No. 23 Civ. 2250 (LGS), ECF No. 31, (S.D.N.Y. Apr. 21, 2023), only for the fact that the case was filed in the Southern District of New York, the identity of the parties, and that certain facts were alleged in the Amended Complaint.

respect to the remaining claims, all defendants here, except TRA (which was not a party to the prior case), consented to jurisdiction over the claims brought here.

ii.    *UERI and TRA are Not Subject to Jurisdiction*
       *Pursuant to the Registration Rights Agreement*

Plaintiffs argue for the first time in their opposition to the motion to dismiss that TRA and UERI consented to jurisdiction in New York by entering into the Registration Rights Agreement ("RRA").[11]  Pl. Opp. at 39. They allege that the RRA contains a forum selection clause which requires TRA and UERI to "submit[] to the exclusive jurisdiction of the United States federal and state courts located in New York County, New York in any Action arising out of or relating to this Agreement."  Pl. Opp. at 28 (citing RRA § 5.4(b)).  The parties dispute whether the RRA was in fact an enforceable contract.  *Compare* Pl. Opp. at 28 (RRA became enforceable "when [it] was executed concurrently with the Merger Agreement") *with* Def. Reply. at 12, 22 (the RRA "would become fully effective upon the merger's closing.").

The Plaintiffs do not allege facts sufficient to make a *prima facie* showing that the forum selection clause in the RRA is legally binding.  While Plaintiffs allege that the "terms of the Registration Rights Agreement constitutes a valid, binding, and enforceable agreement between the parties," FAC ¶ 398, this is a legal conclusion that the Court need not credit on a motion to dismiss.  *See Iqbal*, 556 U.S. at 678; *O'Neill*, 714 F.3d at 673.  Moreover, Plaintiffs themselves allege that "[i]n October of 2021, TRA, OMI, and 26 Capital also agreed to a [Registration Rights Agreement], which *would become fully effective* upon the closing of the SPAC transaction between 26 Capital Acquisition Corporation and Defendants."  FAC ¶¶ 142 n.29, 397; Pl. Opp. at 8-9

---

[11] As explained *supra*, in deciding a motion to dismiss a complaint for want of personal jurisdiction, the Court may consider materials outside the pleadings. *Fleming*, 750 F. App'x at 63–64 (citing *Dorchester Fin. Sec., Inc.*, 722 F.3d at 86.  Further, facts asserted in both a complaint and opposition to a motion to dismiss "are assumed to be true." *MacDermid, Inc.*, 702 F.3d at 728 (2d Cir. 2012) (citing *Hoffritz for Cutlery, Inc.*, 763 F.2d at 56–57).

(emphasis added). Plaintiffs allege the SPAC transaction did not close. *See* FAC ¶¶ 309-10; Pl.

Opp. at 1. Finally, the Plaintiffs' Opposition quotes the RRA, which states that "th[e RRA] is being

executed concurrently with the entry in the Merger and Share Acquisition Agreement and *will*

*become effective* upon the Effective Time," which is defined as "the effective time of the Merger."

Pl. Opp. at 9 n.12 (emphasis added). However, Plaintiffs do not define "effective time of the

Merger" in order to support their claim that the RRA is effective and binding.  Upon the Court's

review of the Merger Agreement itself,[12]  "Effective Time" in the Merger is defined as "the time

that the Certificate of Merger is accepted for filing by the Secretary of State of the State of

Delaware or such a later date and times as specified in the Certificate of Merger," which may only

occur on or after the "Closing Date." *See* Merger Agreement ¶ 3.2. As noted, Plaintiffs allege that

the Merger Agreement did not close. FAC ¶¶ 309-10. As such, the RRA could not be effective. In

short, Plaintiffs have not demonstrated that the RRA is an enforceable contract, and thus have not

shown that UERI and TRA consented to jurisdiction through the RRA.

iii.    *UERI, TRA, and TRLEI are Not Subject to Jurisdiction*
        *Pursuant to New York's Long-Arm Statute*

        Plaintiffs allege that UERI, TRA, and TRLEI also are subject to specific personal

jurisdiction pursuant to New York's long-arm statutes. Specifically, Plaintiffs claim Defendants

are subject to jurisdiction under CPLR § 302(a)(1) because they "transacted business in New

York," and CPLR § 302(a)(3) because they "committed tortious conduct in connection with those

---

[12] "On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside the pleadings, including accompanying affidavits, declarations, and other written materials." *United States Sec. & Exch. Comm'n v. Passos*, No. 1:22-CV-3156-GHW, 2024 WL 5203022, at *4 (S.D.N.Y. Dec. 21, 2024) (citing *Knight v. Standard Chartered Bank*, 531 F. Supp. 3d 755, 760 n.1 (S.D.N.Y. 2021) and citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727–28 (2d Cir. 2012)). The Merger Agreement is referenced and relied on throughout the Amended Complaint, it is publicly available through a link provided in the Plaintiffs' Opposition, *see* Pl. Opp. at 9 n.12, and it is appended to the Declaration of Grant R. Mainland in support of the motion to dismiss, *See* [ECF No. 55-16 ("Merger Agreement")].

business dealings causing harm to Plaintiffs, who were in New York at the time. . . ." FAC ¶ 12. Plaintiffs fail to allege personal jurisdiction under either section of New York's long arm statute.

(a)    CPLR 302(a)(1)

Under CPLR § 302(a)(1), this Court has jurisdiction over a non-domiciliary that "transacts any business within the state or contracts anywhere to supply goods or services in the state." CPLR § 302(a)(1) confers personal jurisdiction over a defendant only "[a]s to a cause of action arising from such a transaction." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022) (quotation marks removed) (quoting CPLR § 302(a)(1)). Defendants urge that "Plaintiffs do not allege that UERI, TRA, and TRLEI transacted any relevant business within New York." Def. Mem. at Mot. at 37-38. Plaintiffs argue that the three purported contracts—the RRA, the Merger Agreement, and the Note Purchase Agreement—sufficiently establish that UERI, TRA, and TRLEI transacted business in New York.  *See* Pl. Opp. at 41.

To have "transacted business" under CPLR § 302(a)(1), a defendant must have engaged in such a continuous and systematic course of doing business in New York as to warrant a finding of its presence in the jurisdiction." *Dardana Ltd. v. Yugraskneftegaz*, 317 F.3d 202, 205 n. 9 (2d Cir. 2003). The Defendant must have "purposefully avail[ed] itself to the privilege of conducting activities within" New York. *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508, 881 N.E.2d 830, 834 (N.Y. 2007); *DirecTV Latin America, LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 420 (S.D.N.Y. 2010).

Plaintiffs do not allege facts supporting a finding that that UERI, TRA, or TRLEI transacted business within the New York or contracted elsewhere to supply goods or services in New York.  First, the RRA does not constitute transaction of business in New York. TRA and UERI entered into the RRA, which was never effectuated, with 26 Capital. FAC ¶ 142 n.29.

Plaintiffs do not allege that 26 Capital is a New York-based company, nor do they allege any other fact tying the RRA to New York or the provision of services or goods in New York. *Id.*

Second, the Merger Agreement does not constitute a transaction of business in New York. The Complaint does not allege that any of the signatories to the Merger Agreement were domiciled in New York, that it was negotiated or executed in New York, or that it was intended to provide services or goods in New York. FAC ¶ 142 ("26 Capital and certain UEC affiliates signed a merger agreement ('the Merger Agreement') whereby UERI would merge with 26 Capital and become a publicly-listed company on the Nasdaq."). Plaintiffs point to the fact that, related to the Merger Agreements, a New York-based UHY LLP audited TRLEI's financial statements used in the SEC filings required to close the SPAC merger, FAC ¶ 214, and UEC Defendants had the intention to list UERI's stock was on the Nasdaq. FAC ¶ 142. Again, Plaintiffs allege no facts suggesting that, in being audited by UHY or intending to list UERI on Nasdaq, the Defendants transacted business in the state or contracted outside of the state to supply goods or services in the state. And Plaintiffs cite to no case to support their contention that receiving services from a New York-based audit company or merely intending to list stock on a New York stock exchange amounts to a purposeful availment of the privilege of conducting business within New York. In fact, New York courts have held that even the successful listing of a company on a New York stock exchange does not satisfy CPLR § 302(a)(1). *See Poms v. Dominion Diamond Corp.*, No. 655733/2017, 2019 WL 2106090, at *3 (N.Y. Sup. Ct. May 15, 2019); *Deer Consumer Prods., Inc. v. Little*, 35 Misc. 3d 374, 387, 938 N.Y.S.2d 767, 779 (Sup. Ct. 2012).

Third, the Note Purchase Agreement on which Plaintiffs rely does not constitute transaction of business in New York. That Agreement offered notes in UEC. While the Agreement was subject to New York law and jurisdiction, it (a) was sent to but never entered into by Plaintiff Zama and

(b) was entered into by non-part investors based in New York. FAC ¶¶ 61-62 & 67-70; Pl. Opp. at 49. Even if the Agreement did amount to a transaction in New York, it was an offering made by UEC, and has nothing to do with TRA, TRLEI, and UERI. Taken together, the actions Plaintiffs cite do not amount to "continuous and systematic course of doing business in New York" by the Defendants. *See Dardana Ltd.*, 317 F.3d at 205 n. 9 (2d Cir. 2003).

(b)    CPLR 302(a)(3)

Under CPLR § 302(a)(3), this Court has jurisdiction over a non-domiciliary that:

> commits a tortious act without the state causing injury to person or property within the state, . . . if [it] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

CPLR § 302(a)(3).

Generally, an injury under CPLR § 302(a)(3) "does not occur within the state simply because the plaintiff is a resident." *See Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990). Similarly, the "suffering of economic damages in New York is insufficient, alone, to establish a direct injury in New York for N.Y. C.P.L.R. § 302(a)(3) purposes." *See Troma Ent., Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 218 (2d Cir. 2013). In determining whether there is injury in New York sufficient to warrant Section 302(a)(3) jurisdiction, Courts apply a "situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" *See DiStefano v. Carozzi No. America, Inc.*, 286 F.3d 81, 84–85 (2d Cir. 2001) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir.1999)). The "original event" occurs "where the first effect of the tort . . . that ultimately produced the final economic injury" is located. *See DiStefano*, 286 F.3d at 84–85.

Plaintiffs allege the Court has jurisdiction because "UERI, TRA, and TRLEI . . . committed tortious conduct in connection with th[eir] business dealings causing harm to Plaintiffs . . . in New York." FAC ¶ 12. Plaintiffs appear to argue under two theories related to CPLR § 302(a)(3). Both fail.

First, Plaintiffs assert that "courts usually find the situs of the injury, in tortious interference actions, is where the company lost business," and, here, they contend, the situs of the injury was New York. *See* Pl. Opp. at 40-41 (quoting *United Mobile Techs., LLC v. Pegaso PCS*, 509 Fed. Appx. 48, 50 (2d Cir. 2013)). Importantly, this argument about the situs of injury for tortious interference claims could only apply to TRLEI, since it is the only Defendant against whom Plaintiffs have alleged tortious interference. FAC ¶¶ 375-88. Moreover, Plaintiffs exclude an important part of the quoted language from the Second Circuit in the *United Mobile Technologies* case. The full sentence is as follows: "Courts usually find the situs of the injury, in tortious interference actions, is where the company 'lost business,' *not the location from which the company primarily operates*." *United Mobile Techs., LLC v. Pegaso PCS, S.A. de C.V.*, 509 F. App'x 48, 50 (2d Cir. 2013) (emphasis added). Accordingly, Plaintiffs' existence in New York is insufficient to establish a situs of injury in New York. In fact, the "loss of business" sufficient to establish a situs of injury in New York must occur "in the New York market in the form of lost sales or customers" in New York. *See Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 336 (S.D.N.Y. 2008) (*Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 568 (S.D.N.Y. 2000)). Beyond establishing that they operate from New York, Plaintiffs have not alleged any facts that the alleged tortious interference by TRLEI led to a loss of business, sales or customers, in New York.

Second, Plaintiffs allege that there was an in-state injury because "Plaintiffs were injured by UEC's breach of the Engagement Letters and the injury and loss occurred in New York." Pl. Opp. at 41. A breach of contract by UEC is irrelevant to establishing jurisdiction over TRA, TRLEI, and UERI. Moreover, Plaintiff ignores well-settled law that makes clear that breach of contract is not considered a tortious act under New York law and cannot form the basis for long-arm jurisdiction under CPLR 302(a)(3). *See Amigo Foods Corp. v. Marine Midland Bank-New York*, 39 N.Y.2d 391, 396 (1976); *AVRA Surgical Robotics, Inc. v. Gombert*, 41 F. Supp. 3d 350, 361 (S.D.N.Y. 2014).

At bottom, Plaintiffs fail to allege an in-state injury and, even if they had, they do not allege that UERI, TRA, and TRLEI "(i) regularly does or solicits business" in New York, "derives substantial revenue from goods used or consumed or services rendered," in New York, or otherwise "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." *See* CPLR § 302(a)(3).

iv.    *UERI, TRA, and TRLEI are Not Subject to Jurisdiction Pursuant to the Engagement Letters*

Finally, Plaintiffs also assert that UERI, TRLEI, and TRA are subject to personal jurisdiction in New York based on UEC's consent to jurisdiction in the First and Second Engagement Letters. Pl. Opp. at 37–40. Specifically, Plaintiffs argue that UERI, TRLEI, and TRA consented to jurisdiction through the Engagement Letters, though they are not signatories to the letters, because they are subsidiaries of UEC and "mere department[s] of UEC," and they have the same interests as UEC. FAC ¶ 10.

A non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory only when the non-signatory is "closely related" to another signatory. *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013). In

31

such instances, the relationship between the non-signatory and the signatory must be sufficiently close that the non-signatory's enforcement of the forum selection clause is "foreseeable" to the signatory against whom the non-signatory wishes to enforce the forum selection clause. *See Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir.1993); *In re Optimal U.S. Litig.,* 813 F. Supp. 2d at 369.

Here, Plaintiffs urge the Court to adopt an inverse theory: that Plaintiffs, signatories to those Engagement Letters,[13] can invoke the forum selection clause in those Engagement Letters to force non-signatories, UERI, TRLEI, and TRA, to defend against Plaintiffs' claims in this Court, even though the Defendants object to the exercise of personal jurisdiction. Pl. Opp. at 39-40. Some courts have endorsed such a theory, as Plaintiffs note. *Id.* (citing *Metro-Goldwyn-Mayer Studios Inc. v. Canal+ Distribution S.A.S.*, 2010 WL 537583, at *5 (S.D.N.Y. Feb. 9, 2010) and citing *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147 (E.D.N.Y. 2012) (collecting cases)). More recent cases have criticized the approach for running afoul of constitutional principles of due process. *See, e.g.*, *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 393-95 (S.D.N.Y. 2019); *Beskrone v. Berlin*, 656 F. Supp. 3d 496, 513-15 (S.D.N.Y. 2023). This Court agrees that constitutional concerns prohibit the application of the "closely related" doctrine in this case.

"The rules governing personal jurisdiction . . . are driven by constitutional concerns over 'the court's power to exercise control over the parties.'" *Arcadia*, 356 F. Supp. 3d at 394 (quoting *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979)). Where a plaintiff seeks to bring suit

---

[13] The Court notes that "UEC entered into the First Engagement Letter with [only] Zama Capital Advisors LP" *see* FAC ¶ 335, and only Zama Capital Strategy Advisors LP signed the Second Engagement Letter with UEC, *see* FAC ¶ 150-151. As such, the Court construes Plaintiffs' argument here as Zama Capital Advisors LP, a signatory to the First Engagement Letter, seeking to enforce that contract against non-signatories, UERI, TRLEI, and TRA and similarly as Zama Capital Strategy Advisors LP, a signatory to the Second Engagement Letter, seeking to enforce that contract against non-signatories, UERI, TRLEI, and TRA.

against a foreign defendant, the plaintiff must show that the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). As a result, a court is without personal jurisdiction over a defendant unless "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

As discussed above, Plaintiffs assert no facts suggesting that UERI, TRLEI, or TRA purposefully availed themselves of New York and thus have not established that they should have reasonably anticipated the possibility of being hauled into court here.

Because the Court concludes that Plaintiffs have not made a *prima facie* showing that this Court has personal jurisdiction over TRA, the Court is without authority to adjudicate the claims against it. TRA's Motion to Dismiss for lack of personal jurisdiction is therefore granted. UERI's Motion to Dismiss for lack of personal jurisdiction with respect to Plaintiff's claim of breach of the RRA is also granted, for the reasons stated above. As previously discussed, there is personal jurisdiction over UEC, UERI, and TRLEI with respect the remaining substantive claims against them. The Court therefore addresses those claims on the merits.

## II.    Failure to State a Claim

Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiffs' Amended Complaint in its entirety for failure to state a claim upon which relief can be granted.

### A.    Breach of Contract Claims

Plaintiffs allege that UEC breached the First and Second Engagement Letters. FAC ¶¶ 334-51 (Counts I & II). Before turning to the merits of those claims, the Court notes that only Zama Capital Advisors entered into the First Engagement Letter with UEC, *see id.* ¶ 335, and only Zama

33

Capital Strategy signed the Second Engagement Letter with UEC. *See id.* ¶ 150-151. This raises a question of standing. Defendants do not raise standing as a defense to either breach claim in either Count I or II. However, as previously explained, this Court has the duty to determine *sua sponte* whether Plaintiffs have standing. *See Green Haven*, 16 F.4th at 78.

Injury in fact is the "first and foremost" element of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration omitted). A party may seek redress for injuries done to that party, but it may not for "injuries done to others." *Rynasko v. New York Univ.*, 63 F.4th 186, 193 (2d Cir. 2023) (quoting *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972)). Third-party beneficiaries have standing to sue for a breach of contract, but non-parties lack standing absent a valid assignment of the claim. *Id.* at 194 (citing *Hillside Metro Associates, LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 50 (2d Cir. 2014) (finding a non-party to a contract who is not a third party beneficiary to the contract lacked standing to assert a breach of that contract) and citing *Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.a.r.l.*, 790 F.3d 411, 418 (2d Cir. 2015) (same)). Plaintiffs have alleged no facts to suggest that either Zama entity was a third-party beneficiary of the contract to which it is not a signatory or that it was assigned a breach of contract claim. Thus, non-signatory Zama Capital Strategy's claim that UEC breached the First Engagement Letter and non-signatory Zama Capital Advisor's claim that UEC breached the Second Engagement letter are both dismissed for lack of standing. Each Zama entity has standing to assert a breach of contract claim with respect to the contract it entered, however.

To plead breach of contract, a plaintiff must allege that: (1) a contract exists, (2) plaintiff performed in accordance with the contract, (3) defendant breached its contractual obligations, and (4) defendant's breach resulted in damages. *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52, 198 N.E.3d 1282, 1287 (N.Y. 2022); *Second Source Funding, LLC v. Yellowstone Capital*, 144

A.D.3d 445, 445–46, 40 N.Y.S.3d 410, 411 (1st Dep't 2016). An agreement that is "complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166 (N.Y. 2002). A contract is unambiguous its language has "a definite and precise meaning." *Id.*

Further, damages for a breach of contract claim include direct damages compensating for the promised performance, and consequential damages, compensating for additional losses incurred due to the breach. *See Appliance Giant, Inc. v. Columbia 90 Assoc., LLC*, 8 A.D.3d 932, 934, 779 N.Y.S.2d 611, 613 (3d Dep't 2004).

i.    *Zama Capital Advisors States a Plausible*
      *Breach of the First Engagement Letter*

Zama Capital Advisors alleges that UEC breached the First Engagement Letter by failing to properly indemnify Zama Capital Advisors for several claimed losses resulting from the First Engagement Letter and by failing to secure a release for Zama Capital Advisors in the settlement resulting from the Delaware Litigation. Zama plausibly states a claim of breach with respect to certain losses under the indemnification clause, but fails to state a claim with regard to the UEC's purported failure to secure a release for Zama Capital Advisors in the Delaware Litigation.

(a)    Indemnification Clause

Plaintiffs claim they are entitled to indemnification by UEC. Plaintiffs' broad language in its Prayer for Relief—appearing to encompass as much potential recovery as possible—does not make clear what exactly Plaintiffs claim that Defendants should indemnify. *See* FAC at 103. Nevertheless, based on the Opposition filed by Plaintiffs and their representations at oral argument, the Court has discerned that Zama Capital Advisors generally seeks to recover (1) "losses that Zama incurred on its investments in UEC, 26 Capital Acquisition Corp., and 26 Capital's sponsor;" (2) "other losses incurred by Zama in connection with the engagement letters with UEC and the

transaction between 26 Capital and the Okada Manila Casino . . . .", *see* FAC at 103, and (3) reimbursement for "attorneys' fees, costs, and all other expenses incurred by Zama in connection with the engagement letters with UEC and the transaction between 26 Capital and the Okada Manila Casino (including defending itself in litigation filed by UEC and responding to subpoenas served on it by the Okada Manila Casino and its affiliates)  . . . ." *Id.* at 103, ¶¶317-18; Pl. Opp. 23-24 & n.22 (clarifying that Plaintiffs do not seek "indemnification for disputes [Zama] has initiated against third parties. . . ." Pl. Opp. at 23 n.22); Tr. at 40–42 (at oral argument, Zama focused on reimbursement for legal fees associated with responding to subpoenas from UEC in the Delaware Litigation to which Zama is not a party and losses incurred "arising out of its investment in connection with this merger.").  For the foregoing reasons, Zama Capital Advisors has plausibly stated a breach of the indemnification clause with respect to certain costs incurred, but not with respect to its investments in UEC, 26 Capital Acquisition Corp., and 26 Capital's sponsor.

      The indemnification clause in the First Engagement Letter reads in the relevant part:

> [UEC] agrees that it *will indemnify and hold harmless* Zama and its affiliates and their respective directors, officers, agents and employees . . . (each, an "Indemnified Party"), to the full extent lawful, from and against any losses, expenses, claims or proceedings including shareholder actions (collectively, "Losses") . . . related to or arising out of the Engagement or any Transaction or conduct in connection therewith, except that this clause [] shall not apply with respect to any Losses to the extent such Losses are finally judicially determined to have resulted from the gross negligence or willful misconduct of such Indemnified Party ("Uncovered Losses") . . .

> [UEC] will also *promptly reimburse* each Indemnified Party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred by such Indemnified Party in connection with investigating, preparing for, defending, or providing evidence in, any pending or threatened claim or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not Zama or any Indemnified Party is a party to such claim or proceeding) or in enforcing this Annex.

First Engagement Letter, Annex A (emphasis added).

Under New York law, indemnification clauses "must be strictly construed so as not to read into [them] any obligations the parties never intended to assume." *BNP Paribas Mortg. Corp. v. Bank of America, N.A.*, 778 F. Supp. 2d 375, 415–16 (S.D.N.Y. 2011) (citing *Haynes v. Kleinewefers and Lembo Corp.*, 921 F.2d 453, 456 (2d Cir.1990)). The default presumption in New York courts is that indemnification involves liabilities, losses, or claims *associated with third-party suits*, rather than contractual damages or losses from litigation between the contracting parties themselves. *See, e.g.*, *Sage Sys., Inc. v. Liss*, 39 N.Y.3d 27, 31–32, 198 N.E.3d 768, 770–71 (N.Y. 2022) (citing *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 493, 548 N.E.2d 903, 905 (N.Y. 1989)) (absent clear intent to the contrary, a "a typical, broadly worded indemnity provision" refers to and covers third-party claims); *Rothberg v. Phil's Main Roofing, LLC*, No. 14-CV-10195 (NSR), 2017 WL 1162904, at *7 (S.D.N.Y. Mar. 24, 2017); *BNP Paribas Mortg. Corp.*, 778 F. Supp. 2d at 416.

As such, indemnification clauses are not construed to cover first-party claims unless the contract makes it "unmistakably clear" that the parties intended to so provide. *See Sage Sys.*, 39 N.Y.3d at 31–32, 198 N.E.3d at 770–71; *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 21 (2d Cir. 1996) (absent "unmistakably clear" language extending indemnification to claims between indemnitor and indemnitee, provision must be construed as limited to actions brought by third parties against the indemnitee). Unless the indemnification clause refers "exclusively or unequivocally" to claims between the indemnitor and indemnitee, the court "must find the agreement to be lacking evidence of the required intent" to cover such claims. *Sequa Corp. v. Gelmin*, 851 F. Supp. 106, 110–11 (S.D.N.Y. 1994) (dismissing first-party "indemnity" claims); *Bourne Co. v. MPL Commc'ns, Inc.*, 751 F. Supp. 55, 57–58 (S.D.N.Y. 1990)

(same); *see also Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 493, 548 N.E.2d 903, 905 (N.Y. 1989)) (an indemnification clause "must contain 'unmistakably clear' language of the parties' intent" to encompass legal fees for suits between the parties); *GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 329–30 (S.D.N.Y. 2009) (indemnification clause will not be construed to cover suits between indemnitor and indemnitee unless the parties "explicitly provide" such coverage).

Here, Plaintiff may not recover losses from its investment in UEC or 26 Capital. Each example of the "losses" and "expenses" covered in the indemnification clause involve some kind of lawsuit, specifically the defense of third-party lawsuits. For instance, the indemnification clause expressly covers potential "shareholder actions," expressly excludes "Losses [that] are finally *judicially determined* to have resulted from the gross negligence or willful misconduct," and expressly covers "counsel fees and expenses" incurred while "investigating, preparing for, defending, or providing evidence in, any pending or threatened claim or proceeding in respect of which indemnification or contribution may be sought hereunder . . . ." *See* First Engagement Letter, Annex A. Further, Plaintiffs concede in the Amended Complaint that the First Engagement Letter does not include a fee to be paid to Zama Capital Advisors.  FAC ¶¶ 103, 107.  In seeking to recover investment losses and losses incurred in connection with the Engagement Letter and Merger Agreement, Plaintiffs in effect ask the Court to read into the indemnification agreement a true performance fee for Zama Capital Advisors. The Court may not rewrite the contract to include a benefit for Zama Capital Advisors for which the parties did not bargain. *See, e.g.*, *Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404, 920 N.E.2d 359, 363 (N.Y. 2009) ("Courts may not . . . make a new contract for the parties under the guise of interpreting the writing"). Accordingly, the indemnification clause here does not allow Zama Capital Advisors to

recover losses that Zama incurred on its investments in UEC, 26 Capital Acquisition Corp., and 26 Capital's sponsor.

However, Plaintiffs plausibly state a claim of breach of the indemnification clause with respect to the duty of UEC to pay Zama Capital Advisors for expenses incurred in responding to third-party subpoenas in the Delaware Litigation. The language of the indemnification clause plausibly encompasses such expenses. It provides that UEC will cover expenses "related to or arising out of the Engagement or any Transaction or conduct in connection therewith," and that [UEC] will also promptly reimburse each Indemnified Party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred by such Indemnified Party in connection with investigating, preparing for, defending, or providing evidence in, any pending or threatened claim or proceeding in respect of which indemnification or contribution may be sought hereunder (*whether or not Zama or any Indemnified Party is a party to such claim or proceeding*). . . ." *See* First Engagement Letter, Annex A (emphasis added). In the Delaware Litigation, 26 Capital and its affiliates sued TRA, TRLEI, and an entity called Tiger Merger Sub, Inc. for specific performance of the Merger Agreement. *See 26 Capital Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 439 (Del. Ch. 2023)). Further, the Delaware Court's analysis regarding whether to granting specific performance included several references to both Engagement Letters. *26 Cap. Acquisition*, 309 A.3d at 443, 443–45 447, 452, 472. Accordingly, the litigation is "related to or arising out of the Engagement" and the "connected" transaction of the merger. Further, responding to subpoenas from the defendants in the Delaware Litigation plainly amounts to "providing evidence in" that action and Zama Capital Advisors' role as a non-party to the litigation does not bar coverage because the indemnification clause specifically covers such expenses "whether or not" Zama Capital Advisors is a party to that litigation.  Moreover, expenses incurred in responding

to third-party subpoenas fall within the typical scope of indemnification clauses—expenses incurred in third-party actions against an indemnified party. *See Best Brands Consumer Prods., Inc. v. Versace 19.69 Abbigliamento Sportivo S.R.L.*, No. 17-CV-4593 (VSB), 2023 WL 4348354, at *3 (S.D.N.Y. July 5, 2023), *aff'd*, No. 23-1115-CV, 2024 WL 2952151 (2d Cir. June 12, 2024) (finding a third party subpoena was an "action against" an indemnified party and the legal expenses incurred in responding to the subpoena was a loss within the scope of an indemnification clause).

Defendant's argument that the expenses Zama Capital Advisors incurred in responding to subpoenas in the Delaware action are "Uncovered Losses" is unavailing. Def. Mem. at 18-19. Defendants correctly state that the indemnification clause carves out "Lossess [that] are finally judicially determined to have resulted from the gross negligence or willful misconduct of [the] Indemnified Party." *See* Def. Mem. at 18 (citing First Engagement Letter, Annex A). Defendants cite to several statements made by the Delaware court and draw the conclusion that the court "unquestionably concluded" that Zama engaged in gross negligence or willful misconduct. *See id.* (citing *26 Capital Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 439 (Del. Ch. 2023)). But no Zama entity was a defendant in that case, and so the Delaware Court could not have finally judicially determined Zama's legal culpability. Moreover, even if the Delaware Court had reached such a legal conclusion, Defendants do not and could not explain how Zama Capital Advisor's "losses," here their expenses in responding to third-party subpoenas "resulted from" any negligence or misconduct.

It is unclear exactly what other "attorneys' fees, costs, and . . . other expenses" Zama Capital Advisors seek to recover or what facts give rise to those alleged indemnifiable expenses. FAC ¶¶ 317-18. The same is true with respect to the catchall language "other losses incurred by Zama in connection with the engagement letters with UEC and the transaction between 26 Capital

and the Okada Manila Casino." *See* FAC at 103.  Since Plaintiffs do not precisely delineate what they are seeking to recover as losses and the record is not developed with respect to the facts giving rise to those losses, the Court cannot say as a matter of law that Zama Capital Advisors may not recover these losses.

In sum, Zama Capital Advisors has plausibly stated a breach of the indemnification clause with respect to costs incurred while responding to third-party subpoenas in the Delaware Litigation and other losses related to the First Engagement Letter or related conduct or transactions, but not with respect to its investments in UEC, 26 Capital, and 26 Capital's sponsor.

(b)    Settlement Release

Next, the breach of conduct claim by Zama Capital Advisors with respect to the Delaware Litigation settlement fails. Plaintiffs allege that "UEC attempted to settle its ongoing litigation with 26 Capital Acquisition Corp. by entering into a settlement agreement. While Zama believes that such settlement is invalid, UEC breached the First Engagement Letter by agreeing to the settlement without Zama receiving any releases in the settlement." FAC ¶ 341. In the First Engagement Letter, UEC agreed "it will not . . . settle any pending or threatened claim or proceeding related to or arising out of the Engagement or any actual or proposed Transactions or other conduct in connection therewith (whether or not Zama … is a party …) unless such settlement includes a[n] unconditional[] releas[e of] Zama … from all liability in respect of claims … related to or arising out of the Engagement or any Transactions or conduct in connection therewith." FAC ¶ 340.

Defendants move to dismiss this claim for several reasons including the fundamental ground that "UEC is not a party to the Settlement Agreement." Def. Mem. 20. Zama Capital Advisors, incredibly, does not dispute this and instead argues that Defendants make an "incorrect assumption that UEC itself must sign a written settlement for it to be in breach." Pl. Opp. 25.

Notably, this assertion contradicts outright the facts alleged in the Complaint. FAC ¶ 341 ("UEC attempted to settle its ongoing litigation with 26 Capital Acquisition Corp. by entering into a settlement agreement. While Zama believes that such settlement is invalid, UEC breached the First Engagement Letter by agreeing to the settlement without Zama receiving any releases in the settlement."). [14]

Instead, Zama Capital Advisors argues that UEC should be held in breach because it controls and dominates UERI, TRLEI, and TRA . . . each of which *was* a party to the Delaware settlement." Pl. Opp. at 25 n.24. Zama Capital Advisors cites no law or facts supporting the contention that UEC could be liable for breach based on the actions of its subsidiaries. The language of the First Engagement Letter itself requires that UEC must get consent from Zama prior to settling a related claim or proceeding. FAC ¶ 341. Moreover, a "parent corporation and its subsidiary are 'legally distinct entities and a contract under the corporate name of one is not treated as that of both.'" *Mercator Corp. v. Windhorst*, 159 F. Supp. 3d 463, 470 (S.D.N.Y. 2016)). Accordingly, Zama Capital Advisors fail to allege facts sufficient to state a claim for breach of the release provision.

ii.    *Zama Capital Strategy States a Plausible Breach of the Second Engagement Letter*

First, Zama Capital Strategy alleges that UEC breached the Second Engagement Letter for the same reasons it claimed UEC breached the First Engagement Letter—by failing to properly

---

[14] Though the Court must "accept as true all factual statements alleged in the complaint" *see Iqbal*, 556 U.S. at 678, *McCarthy*, 482 F.3d at 191, Plaintiff now has contradicted this allegation in its opposition to the motion to dismiss by conceding that UEC was not a party to the Settlement Agreement. Pl. Opp. 25 ("The UEC Defendants' argument also ignore allegations that UEC controls and dominates UER, TRLEI, and TRA . . . each of which *was* a party to the Delaware settlement agreement"). *See Fisk v. Letterman,* 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005) ("[t]he Court [] is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint."). Moreover, the Court takes judicial notice of the Delaware Litigation, *see 26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.,* 309 A.3d 434, 441 (Del. Ch. 2023), which plaintiff cites and relies upon extensively in the Amended Complaint, *see, e.g.*, FAC ¶¶ 311–20, 332 for the limited purpose of noting that UEC was not a party to the suit.

indemnify Zama Capital Strategy for the same claimed losses as those alleged in association with the First Engagement Letter and by failing to secure a release for Zama Capital Strategy in the settlement resulting from the Delaware Litigation. FAC ¶¶ 347–52; Pl. Opp. at 26. Neither party makes any arguments related to the indemnification and release provisions of the Second Engagement Letters beyond what they have argued related to those same provisions in the First Engagement Letter. Def. Mem. 12–21; Pl. Opp. at 26. The language relevant to the Court's analysis of these provisions is nearly identical in the First Engagement Letter and the Second Engagement Letter. *Compare* First Engagement Letter, Annex A *with* Second Engagement Letter, Annex A. Accordingly, here the Court reaches the same conclusion with respect to the indemnity clause in the First Engagement Letter. Zama Capital Strategy has plausibly stated a breach of the indemnification clause, but not with respect to costs associated with any investment in UEC or 26 Capital. *See* FAC ¶¶ 317–318, 347–50. Further, Zama Capital Strategy fails to allege facts sufficient to state a claim for breach of the release provision. FAC ¶¶ 351–52.

Next, Zama Capital Strategy alleges that it is owed $7.5 million from UEC because the Second Engagement Letter required UEC to pay a "deferred payment of $7,500,000 to be paid in cash, in stock of the Company or OMI, or in a combination of cash and stock at the option of the Company as soon as reasonably practicable following the listing of [UERI] on a US-based exchange . . . ." *See* FAC ¶¶ 353-56 (quoting the Second Engagement Letter). By the express terms of the Second Engagement Letter, the payment is due to Zama Capital Strategy only "*following* the listing of [UERI] on a US-based exchange," *see* FAC ¶ 353. New York Courts find terms similar to "following" such as "if," "unless," "until," and "provided" to be "unmistakable language of condition." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645, 912 N.E.2d 43, 47 (N.Y. 2009); *Natl. Fuel Gas Distrib. Corp. v Hartford Fire Ins. Co.*, 28 AD3d 1169, 1170

(4th Dept 2006). Accordingly, the listing of UERI on a U.S. Exchange is "an act or event, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *See Adler v. Solar Power, Inc.*, No. 16 CV 1635-LTS-GWG, 2018 WL 1626162, at *6 (S.D.N.Y. Mar. 30, 2018). In other words, the listing is a "condition precedent" to UEC's duty to pay Zama. *Id.* The parties both agree that the listing on the US-based exchange is a "condition precedent" to UEC's duty to pay Zama. Def. Mem. at 14; Pl. Opp. at 27. And Plaintiffs acknowledge that condition precedent never occurred. *See* FAC ¶¶ 309-310.

Zama Capital Strategy does not contend that UEC had a duty to bring about the public listing of UERI. It does however assert that by reason of "[UEC's] malicious, and bad faith conduct to prevent the successful listing of [UERI]" Zama Capital Strategy is entitled to recover the $7.5 million "under the 'prevention doctrine' . . . ." FAC ¶¶ 354-55. Under the prevention doctrine, "where a promisor has no duty to bring about the condition precedent to his promise, only active conduct by the promisor to frustrate the occurrence of the condition precedent constitutes waiver of that condition precedent." *In re Bankers Tr. Co.*, 450 F.3d 121, 128 (2d Cir. 2006); *see also Pac. Life Ins. Co. v. US Bank Nat'l Ass'n*, 636 F. Supp. 3d 366, 425 (S.D.N.Y. 2022) ("prevention doctrine applies where the party seeking to rely on the non-existence of a condition precedent (i) had a duty to bring about the condition precedent or (ii) actively frustrated its occurrence.").

Plaintiffs allege that UEC actively frustrated "the closing of the SPAC merger and listing of [UERI] on a U.S. exchange":

- "[i]f it had not been for UEC['s] … intentional, malicious, and bad faith conduct to prevent the successful listing of the [UERI] on the Nasdaq, [UERI] would have successfully been listed and Zama Strategy would have been entitled to this $7,500,000 payment." FAC ¶ 354.
- "UEC started to explore an alternate transaction …" and "Fujimoto wanted to delay the SPAC transaction to explore the ABG transaction … [while] Van Der Sande … email[ed] with reasons why deliberately delaying the deal and contributing assets to ABG constituted a breach under the Merger Agreement . . . ." *Id.* ¶¶ 178 & 180.

44

- There was "an underhanded attempt by UEC to put in place a means of either delaying or blocking the consummation of the SPAC transaction." *Id.* ¶ 232.
- "UEC chose not to proceed with the transaction and instead to breach and purportedly terminate the merger agreement." *Id.* at 4.

Pl. Opp. at 28. While Defendants correctly argue that some of the above are conclusory statements and insufficient to state a claim, *see* Def. Reply at 11, Zama Capital Strategy also alleges several other facts which support the inference that UEC purposefully frustrated the SPAC deal. For example, it alleges that various UEC officials, including UEC President Jun Fujimoto and UEC CFO Kenshi Asano, had been planning to terminate the SPAC since August 2022. FAC ¶ 263. Plaintiffs further allege that UEC also delayed providing materials to UHY, the auditor for the SPAC deal. *Id.* ¶ 286. Further, it is alleged that Van Der Sande and Defendant Yip believed that senior leadership of UEC, including President Fujimoto, could be convinced not to extend the merger timeline because they would be a "receptive audience" to their warning that becoming subject to United States regulatory and criminal schemes would create immense risk for these senior executives who approved of, undertook, and engaged in bribery and other illegal acts. *Id.* ¶ 268. UEC did, in fact, decline to approve an extension of the merger timeline, putting the closing of the merger in peril, though it later approved a second extension subject to an amendment. *Id.* ¶¶ 214, 231, 235, 263-309. Taken together these facts plausibly state that UEC purposefully frustrated the SPAC deal.

Defendants accurately point out that the condition precedent in the Second Engagement Letter was UERI's public listing in a US market, not UERI's prelisting merger with 26 Capital to the exclusion of all other suitors. Def. Reply at 11; FAC ¶ 152. It was, however, the listing of the surviving company that resulted from the merger that was a condition precedent to Zama's right to payment. Zama Capital Strategy does allege sufficient facts in the Complaint to "nudg[e] . . . across the line from conceivable to plausible" Plaintiff's claim that UEC acted to frustrate the

SPAC transaction and, more generally avoid the legal scrutiny associated with the listing of UERI on a U.S. Exchange. *See Twombly*, 550 U.S. at 569.  As such, at the pleading stage, Plaintiffs state a claim that withstands dismissal under Rule 12(b)(6) with respect to an entitlement to recover $7.5 million and with respect to recovery of litigation expenses associated with responding to subpoenas in the Delaware litigation, but not with respect to any other theories of breach.

## B.    Plaintiffs Fail to State Declaratory Judgment Claims

Zama also brings parallel claims, Count III and IV of the Amended Complaint, seeking a declaratory judgment that, under the First and Second Engagement Letters (i) "UEC is required to indemnify Zama Capital Advisors LP [and Zama Capital Strategy] for all losses and expenses relating to and arising out of this lawsuit and relating to and arising out of and ongoing lawsuits between Zama and Jason Ader, 26 Capital Acquisition Corporation, and Rimu Capital Ltd.; and (ii) the purported settlement agreement between Defendants and 26 Capital Acquisition Corp. is null and void because of the failure to release Zama."  FAC ¶¶ 365, 374. A declaratory judgment is a form of relief and it does not constitute an independent cause of action. *See, e.g.*, *Gregoire v. Citizens Bank*, No. 20-2706, 2021 WL 4127076, at *2 (2d Cir. Sept. 10, 2021); *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 431 (2d Cir. 1994); *Cisco Sys., Inc. v. Synamedia Ltd.*, 557 F. Supp. 3d 464, 474–75 (S.D.N.Y. 2021) (citing *In re Joint Eastern and Southern Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993)). Plaintiffs conceded at oral argument that "there is no freestanding claim for declaratory judgment" and instead declaratory judgment can constitute "relief that you're entitled to by reason of some other legally cognizable claim." Tr. 48–49. Plaintiffs further stated at oral argument that although the declaratory judgment sought is "styled" as an independent claim whether "it's in the form of a request for relief, based

on the breach-of-contract claims or stated as an independent claim, either way, we are asking for the same thing." Tr. 48:23–25.

Accordingly, the Court dismisses the Declaratory Judgment Counts III and IV as standalone causes of action, and construes those counts as requests for declaratory relief in connection with Counts I and II, alleged breaches of the First and Second Engagement Letter. *See, e.g.*, *Gregoire*, No. 20-2706, 2021 WL 4127076, at *2 (affirming the dismissal of declaratory judgment as a "separate claim"); *Haller v. Usman*, No. 24 CIV. 977 (KPF), 2025 WL 605572, at *10 (S.D.N.Y. Feb. 25, 2025) (dismissing a claim for declaratory relief but stating that Plaintiff may "seek declaratory judgment as a remedy for his surviving claims") *Cisco Sys.*, 557 F. Supp. 3d at 474–75 (dismissing claim for declaratory judgment and construing it as a type of relief sought in connection with another cause of action).

## C.    Plaintiffs Fail to State an Unjust Enrichment Claim

Plaintiffs' Count VII is a claim for unjust enrichment against UEC. FAC ¶¶ 389–95. To state a claim for unjust enrichment under New York law a Plaintiff must show that (1) the defendant was enriched; (2) at the expense of the plaintiff; and (3) it would be inequitable to permit the defendant to retain that which is claimed by Plaintiff. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516, 973 N.E.2d 743, 746 (2012); *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 167 (S.D.N.Y. 2021). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 944 N.Y.S.2d 732, 967 N.E.2d 1177, 1185 (2012).

Under New York law, a Plaintiff may not recover for unjust enrichment if the parties have a "valid, enforceable contract that governs the same subject matter . . . ." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). This restriction

bars recovery by plaintiff here. Zama Capital Advisors and Zama Capital Strategy each negotiated contracts with UEC for their services. Zama Capital Advisors agreed to accept zero fees from UEC for its services under the First Engagement Letter. *Id.* ¶ 103. Zama Capital Strategy agreed to defer much of its payment under the Second Engagement Letter until after the occurrence of a condition precedent that ultimately was not satisfied. *Id.* ¶¶ 353-56.  The Court cannot change the terms of Plaintiffs' negotiated agreements.

Plaintiffs assert that the unjust enrichment claim should survive a motion to dismiss because there is a "bona fide dispute over the existence of the [First Engagement Letter]." Pl. Opp. at 32. But Plaintiffs assert claims under that agreement, FAC ¶¶ 334–42, 375–381, and UEC has not argued in any of its briefing that the First Engagement Letter is invalid, and as such, there is no "bona fide dispute" about the existence of a valid contract.  *Cf. Murray Eng'g P.C. v. Remke*, No. 17 CIV. 6267 (KPF), 2018 WL 3773991, at *11 (S.D.N.Y. Aug. 9, 2018) (finding a "bona fide dispute" where the Defendants' argument that there is no valid contract was "apparent from the face of their opening brief").

For these reasons, Plaintiffs fail to a state claim for unjust enrichment.

### D.    Tortious Interference Claims

*i.    Zama Capital Advisors Fails to State a Claim for
Tortious Interference with the First Engagement Letter[15]*

Zama alleges in Count V that TRLEI tortiously interfered with the performance by UEC under the First Engagement Letter. FAC ¶¶ 375–81.  In essence, Zama brings this claim as an attempt to bring a breach of contract claim under the First Engagement Letter against a non-party to the contract.  Under New York law, a claim for tortious interference with a contract requires "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's

---

[15] The same standing issues as described *supra* § II(A) with respect to the two different Zama entities apply here.

knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

Zama Capital Advisors fails to adequately allege facts to plead the third element of tortious interference with a contract. Plaintiffs make the conclusory allegation that TRLEI "intentionally procured UEC's breach of the First Engagement Letter by, *inter alia*; not permitting it to indemnify Zama Capital Advisors LP for losses and expenses incurred." FAC ¶ 379. However, Zama Capital Advisors alleges no facts to support its legal conclusion that TRLEI "intentionally procured" a breach of the indemnification provision or the settlement release. *See* FAC ¶¶ 316–19; Pl. Opp. at 29–32. As such, the Court need not credit Plaintiff's conclusion that TRLEI did in fact procure a breach in satisfaction of the third element of tortious interference. *Iqbal*, 556 U.S. at 678 (the tenet that the Court "must accept as true all of the allegations contained in a complaint," on a motion to dismiss for failure to state a claim "is inapplicable to legal conclusions."). As such, Zama Capital Advisors fails to plausibly state a claim for breach of the First Engagement Letter.

ii.     *Zama Capital Strategy States a Claim for Tortious Interference with the Second Engagement Letter*

Plaintiffs also allege that TRLEI "intentionally procured UEC's breach of the Second Engagement Letter by, *inter alia*, not permitting it to indemnify Zama Capital Strategy LP for losses and expenses incurred; and not permitting the transaction between 26 Capital and TRLEI, UERI, and Okada Manila Casino to consummate, for which Zama Capital Strategy Advisors LP is entitled $7.5 million." FAC ¶¶ 379, 386.

The portion of this claim alleging that TRLEI procured a breach of the indemnification and settlement release provisions of the Second Engagement Letter by UEC, fails for the same reasons

discussed in the prior section with respect to the First Engagement Letter. *See supra* §§ II(D)(i). Specifically, Zama Capital Strategy advisors failed to allege any facts demonstrating how TRLEI intentionally procured those alleged breaches by UEC. *See* FAC ¶¶ 316–19, 386; Pl. Opp. at 29–32.

However, regarding the portion of this claim which alleges a breach based on the prevention of the closing of the SPAC merger, Zama Capital Strategy plausibly states a claim. At the outset, the Court notes that briefing by both parties attempts to use facts from outside the pleadings to bolster their arguments.[16] As previously explained, when a defendant moves to dismiss for failure to state a claim, the Court accepts the facts asserted in the complaint and may not consider "matters outside the pleadings" without converting the motion to dismiss to a motion for summary judgment. *See, e.g.*, *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154 (2d Cir. 2006); *Nolan v. City of New York*, 2024 WL 4575374, at *5–6 & n.5 (S.D.N.Y. Oct. 25, 2024). As such, the Court will not consider such extraneous facts.

Here, Zama Capital Strategy has adequately plead that: (i) an enforceable contract—the Second Engagement Letter—existed between Plaintiff and a third-party, UEC, *see* FAC ¶¶ 150-53; (ii) TRLEI had knowledge of this contract, in fact TRLEI President, Yip, and TRLEI Chief Financial Officer, Van Der Sande, solicited Zama's entry into the service contract, *see id.* ¶¶ 7, 8, 146-150, 153; (iii) TRLEI's officials intentionally induced UEC to actively avoid the closing of the merger, which resulted in a breach of the Second Engagement Letter, *see id.* ¶¶ 263-79, 284, 302, 308-09; (iv) UEC breached the Second Engagement Letter under the prevention doctrine, *see*

---

[16] For example, Defendants assert that "it was ultimately TRLEI that would be listed in the United States if the deal closed." *See* Def. Mem. at 27. But the Amended Complaint alleges that, through the Merger Agreement, "UERI would merge with 26 Capital and become a publicly-listed company on the Nasdaq." *See* FAC ¶ 142. Plaintiffs state in the opposition that "During the relevant period, TRLEI owned the Okada Manila Casino." Pl. Opp. at 30 (citing Pl. Opp. at 3 and citing Def. Mem. at 10.). This purported fact is not alleged anywhere in the Amended Complaint. In any event, these facts are irrelevant to the Court's analysis of the viability of Plaintiff's claim.

*supra* § II(A)(ii); and (v) Zama Capital Strategy was injured as a result of the inducement, in that it did not receive the $7.5 million due after the merger closed, *see id.*

Zama specifically alleges that TRLEI's officials intentionally induced UEC to actively avoid the closing of the merger through a series of actions: Van Der Sande had been planning to terminate the SPAC deal during the negotiation of the deal; memos prepared by attorneys, at Van Der Sande's behest, advised UEC not to extend the closing of the Merger Agreement; Van Der Sande, concerned that he would be subject to U.S. regulatory scrutiny, attempted to "scare UEC" out of the SPAC merger by claiming that 26 Capital would face a high level of redemptions and be delisted; Yip and Van Der Sande submitted misleading analysis to a UEC board meeting which led the board to agree not to extend the merger agreement deadline; after the merger was later extended, Yip and Van Der Sande delayed providing information to auditors doing work in furtherance of the SPAC deal; and Van Der Sande and Yip coerced the auditor to make false statements about Zama. *See* FAC ¶¶ 263-79, 284, 302, 308-09. These allegations amount to "specific action[s]" sufficiently plead to satisfy the element that TRLEI caused UEC to breach the contract. *See Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20-CV-5015 (VEC), 2021 WL 3668092, at *16 (S.D.N.Y. Aug. 17, 2021). Later, Plaintiffs will have to prove that "the contract would not have been breached 'but for' the defendant's conduct." *Rich v. Fox News Network, LLC*, 939 F.3d 112, 127 (2d Cir. 2019) (quoting *Burrowes v. Combs*, 25 A.D.3d 370, 808 N.Y.S.2d 50, 53 (1st Dep't 2006). But at this stage, the fact that Plaintiffs have pled that TRLEI intentionally induced the breach of the contract is sufficient to satisfy the "but for causation" pleading requirement. *See Bertuglia v. City of New York,* 839 F. Supp. 2d 703, 729 (S.D.N.Y. 2012).

TRLEI argues that, had it induced UEC's breach of contract, it was not "without justification" because TRLEI had an economic interest in doing so. *See* Def. Mem. at 25-26. A defendant may raise an affirmative defense of justification in a pre-answer Rule 12(b)(6) motion only if the defense "appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Moreover, "the defense . . . only applies when the alleged interfering parties have acted to protect their interest in the breaching party's business . . . [and] not their own." *Horowitz v. Nat'l Gas & Elec., LLC*, No. 17-CV-7742 (JPO), 2018 WL 4572244, at *6 (S.D.N.Y. Sept. 24, 2018); *see also Jordan's Ladder Legal Placements, LLC v. Major, Lindsey & Afr., LLC*, No. 21 CV 7124 (CM), 2022 WL 1500772, at *9 (S.D.N.Y. May 12, 2022) ("a party acting in its own direct interest, rather than to protect its stake *in the breaching party*, may not raise the economic interest defense.").  If a defendant can bring such a defense, in addition to pleading the elements of tortious interference, the plaintiff "must also adequately allege that the defendant either acted maliciously, fraudulently, or illegally," *See RBG Mgmt. Corp. v. Vill. Super Mkt., Inc.*, 692 F. Supp. 3d 135, 144–45 (S.D.N.Y. 2023) (quoting *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 406 (S.D.N.Y. 2009)).

Here, TRLEI moves to dismiss Zama Capital Strategy's claim based on the economic interest defense, arguing that (1) it is a subsidiary of UEC and (2) TRLEI had an economic interest in preventing UEC from listing of UERI on a U.S. exchange. *See* Def. Mem. at 26. TRLEI cites to three cases to support the proposition that "a subsidiary tends to have an economic interest in the financial affairs of its parent." Def. Mem. at 26. However, only one of those cases finds that a subsidiary has such an economic interest and, it makes such a determination not on a motion to dismiss, but rather at the summary judgment stage. *See WMW Mach. Co. v. Koerber AG*, 240 A.D.2d 400, 401, 658 N.Y.S.2d 385, 386 (1997) ("[D]efendants, as either the parent or a subsidiary

of the Manufacturers, have an economic interest in the Manufacturers sufficient to support a defense of economic justification.").  At the motion to dismiss stage, courts applying New York law regularly find that a parent has an economic interest in subsidiary, but not the reverse. *See, e.g.*, *EPAC Techs. Ltd. v. Interforum S.A.*, 217 A.D.3d 623, 624, 193 N.Y.S.3d 3 (2023), *leave to appeal dismissed*, 41 N.Y.3d 975, 233 N.E.3d 560 (2024), *cert. denied sub nom. Vivendi S.E. v. EPAC Techs. Ltd.*, No. 24-335, 2024 WL 4874677 (U.S. Nov. 25, 2024); *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 31 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018); *MDC Corp. v. John H. Harland Co.*, 228 F. Supp. 2d 387, 397 (S.D.N.Y. 2002).[17] Further, TRLEI's argument is even more attenuated than the interest of a subsidiary in the business of its parent—TRLEI claims that it has an economic interest in preventing its parent from directing an action of the parent's subsidiary.

Several cases refuse to dismiss a claim that a company tortiously interfered with a contract of its subsidiary or its affiliate where the Court cannot determine whether the defendant acted out of its own interest or out of an interest in the third party. *See Horowitz v. Nat'l Gas & Elec., LLC*, No. 17-CV-7742 (JPO), 2018 WL 4572244, at *6 (S.D.N.Y. Sept. 24, 2018); *U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A. Petrobras,* No. 98 Civ. 3099, 2001 WL 300735, at *24 (S.D.N.Y. March 27, 2001); *Ives v. Guilford Mills, Inc.,* 3 F. Supp. 2d 191, 198 (N.D.N.Y.1998).

Without legal support that subsidiaries *always* have an economic interest in their parents, and absent a showing that, based on the allegations in the Amended Complaint, TRLEI had an economic interest in UEC beyond its own interest, TRLEI has failed to make out the economic

---

[17] The Court notes that the New York Court of Appeals listed examples of relationships in which the economic interest defense "generally appl[ies]" and, in such situation, the party with the economic interest in the breaching party had some semblance of control over the breaching party. The enumerated relationships include, "defendants were significant stockholders in the breaching party's business; where defendant and the breaching party had a parent-subsidiary relationship; where defendant was the breaching party's creditor; and where the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff." *See White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426, 867 N.E.2d 381, 384 (2007).

interest defense at this stage to warrant dismissal as to Zama Capital Strategy's claim. *See Ray Legal Consulting Grp. v. DiJoseph*, 37 F. Supp. 3d 704, 722 (S.D.N.Y. 2014) (quoting *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000) ("Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief."). Accordingly, the Court concludes that, at the pleading stage, Zama Capital Strategy has plausibly stated a claim for tortious interference with the Second Engagement Letter, only as it relates to the prevention of the closing of the merger.

**E.     The FAC Fails to State a Claim for Common Law Fraud**

Plaintiffs' Count IX of the Amended Complaint pleads a claim for common law fraud predicated on allegedly false statement made by UEC, TRLEI, and UERI, on which Plaintiffs relied to their detriment, that UEC has reformed its ways from its previous culture of bribery, corruption, and embezzlement.  FAC ¶¶ 405–13.  To state a claim for fraud under New York law, a plaintiff must allege (a) a material misrepresentation or omission of fact; (2) which defendant knows to be false; (3) made for the purpose of inducing the other party to rely upon it; (4) on which the other party justifiably relied; and (5) which caused injury to the plaintiff.  *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178, 944 N.E.2d 1104, 1108 (2011); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402–03 (2d Cir. 2015). "A claim for common law fraud is subject to the particularity requirements of Federal Rule of Civil Procedure 9(b)." *Id.* at 402–03.

Plaintiffs fail to state an injury for which it can recover in a fraud claim. Under the "out-of-pocket" rule, damages in fraud claims are "the actual pecuniary loss sustained as the direct result of the wrong." *Keystone Foods Holdings Ltd. v. Tyson Foods, Inc.*, No. 22-1113-CV, 2023 WL 3477157, at *2 (2d Cir. May 16, 2023) (citing *Lama Holding Co. v. Smith Barney Inc.*, 88

N.Y.2d 413, 421 (1996). "Under this rule, the loss is computed by ascertaining the difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain." *Id.* Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. *See Negrete v. Citibank, N.A.*, 759 F. App'x 42, 48 (2d Cir. 2019) (quoting *Lama Holding*, 88 N.Y.2d at 421). Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud. *Id.*

In the Amended Complaint, Plaintiffs generally allege that UEC, TRLEI, and UERI made false statements that UEC had "ended [its] previously well-known culture of bribery, corruption, and embezzlement," and Plaintiffs relied on those false statements. FAC ¶¶ 405-13. Plaintiffs conclusorily state that "Zama suffered damages as a result of Zama's reliance upon Defendants' false statements . . . ." FAC ¶ 412. In their Opposition, Plaintiffs clarify that "Plaintiffs suffered financial losses on their investments and lost the opportunity to earn profits once [UERI] was listed on a U.S. exchange." Pl. Opp. at 44. Still, this is insufficient.

Plaintiffs must do more than conclude that they suffered damages. Plaintiffs may not recover based on conclusory statements regarding lost profits that they "might have gained" absent the alleged fraud. *See Connaughton v. Chipotle Mexican Grill, Inc.*, 29 N.Y.3d 137, 143, 75 N.E.3d 1159, 1164 (N.Y. 2017) (plaintiff may not recover for "speculative claims of possible future damages" or "lost opportunity"); *Negrete v. Citibank, N.A.*, 759 F. App'x 42, 48 (2d Cir. 2019) ("[d]amages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained."); *Green Star Energy Sols., LLC v. Edison Properties, LLC*, No. 21-CV-2682 (LJL), 2022 WL 16540835, at *13 (S.D.N.Y. Oct. 28, 2022) ("Plaintiff fails to identify any specific business opportunities that were lost or any other

out-of-pocket expenses it suffered in more than a conclusory fashion. Nor are Plaintiff's claims for 'lost profits' cognizable under New York law."); *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 457 (S.D.N.Y. 2003) (dismissing a claim for fraud where Plaintiffs "merely argue, in their response to the defendants' motion to dismiss, that the value of their investment is less than they were led to believe . . . without any factual allegations to support"). The treatise Plaintiffs cite for the proposition that they may recover for a "loss of opportunity" is inapposite as it discusses injury in fact generally, and not available damages for fraud specifically. *See* Pl. Opp. at 36 (citing Injury in Fact, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed.)). Moreover, to the extent Plaintiffs use "financial losses on their investments" to mean the price they paid for their investments, they may not recover for the "price of the bargain"; fraud damages are "the difference between the value of the bargain . . . and . . . the price of the bargain." *Keystone Foods Holdings Ltd. v. Tyson Foods, Inc.*, No. 22-1113-CV, 2023 WL 3477157, at *2 (2d Cir. May 16, 2023). Plaintiffs do not allege that the price they paid for their investments were inflated. In fact, Plaintiffs allege that they purposefully purchased UEC stock because they believed that the market price undervalued UEC's shares based on "serious reputation challenges" given its "known history of bribery and corruption." FAC ¶ 45. Without claiming recoverable damages, Plaintiffs have failed to state a claim for fraud.

## III.    Motion to Strike

Plaintiffs move to strike the following allegations from the Amended Complaint: That UEC bribed Philippine government officials to obtain a tax refund in 2020 (FAC ¶ 73); that UEC embezzled money from TRLEI through a purported pest control contract (*id.* ¶¶ 187-90); that UEC bribed a senior Philippine legislator and Philippine Supreme Court Justices to regain control of Okada Manila (*id.* ¶¶ 242-51); that UEC fired an executive for alleged "whistleblow[ing]" relating

to embezzlement alleged to have occurred in 2012, many years before the UEC Parties made any of the statements at issue (*id.* ¶¶ 320-28); that "[b]ribery and corruption remain rampant at UEC" (*id.* at 3); that "[t]o this day, UEC's directors and officers . . . continue to break the law" (*id.* ¶ 56); that UEC suffers from "highly dysfunctional corporate governance" (*id.* ¶ 73); that defendants had an "incentive" to try to convince UEC to back out of the SPAC transaction because the executive feared liability under the Foreign Corrupt Practices Act (*id.* ¶ 266); as well as innuendo about alleged discovery abuses (*id.* ¶ 74) and perjury (*id.* ¶ 311).

Under Federal Rule of Civil Procedure 12(f), a district court may strike material from filings on the grounds that it is "redundant, immaterial, impertinent, or scandalous." *See Brown v. Maxwell*, 929 F.3d 41, 51 (2d Cir. 2019). Generally, motions to strike are viewed with disfavor and infrequently granted. *See In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003). Although motions to strike material solely "on the ground that the matter is impertinent and immaterial" are disfavored, when material is also "scandalous," no such presumption applies. *See Brown*, 929 F.3d at 51 n.42. "[A] scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *See Cabble v. Rollieson*, No. 04-CV-9413, 2006 WL 464078, at *11 (S.D.N.Y. Feb. 27, 2006). To prevail under Rule 12(f), the movant must demonstrate (1) the allegations do not bear on issues in the case, (2) no evidence in support of the allegations would be admissible, and (3) to permit the allegations to stand would result in prejudice to movant." *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001) (citing *Koch v. Dwyer*, No. 98 Civ. 5519(RPP), 2000 WL 1458803, *1 (S.D.N.Y. Sept. 29, 2000)). As such, allegations in the pleadings will not be stricken if they have some "possible bearing on the subject matter of the plaintiff's claim." *Velez v. Lisi,* 164 F.R.D. 165, 167 (S.D.N.Y.1995) (citing *Lipsky v.*

*Commonwealth United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976)).   The Second Circuit has warned

that "the courts should not tamper with the pleadings unless there is a strong reason for doing so."

*Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir.1976).

Here, UEC Defendants claim that allegations in the Amended Complaint of "corrupt

conduct and character attacks" should be stricken because they are immaterial, impertinent, and

scandalous.  Def. Mem. at 40-45. The offending allegations are numerous and largely involve

allegations of corruption and illegal activity. Defendants argue that no evidence in support of the

allegations would be admissible because it would be irrelevant, impermissible character evidence.

*See* Def. Mem. at 43.

The Court finds no strong reason here for tampering with the pleadings. The standard for

relevant evidence is quite low. "Evidence is relevant if: (a) it has any tendency to make a fact more

or less probable than it would be without the evidence; and (b) the fact is of consequence in

determining the action." Fed. R. Ev. 401. First, Plaintiffs' allegations of corruption are central to

the falsity element of their fraud claim that Defendants hid or omitted their own corrupt actions in

public statements.  FAC ¶ 406.  Furthermore, the Court cannot state at this preliminary stage that

the subject allegations will not be relevant to Plaintiffs' remaining breach of contract claim.

Plaintiffs allege that Defendants took active steps to interfere with UERI from becoming listed

publicly on a U.S. stock exchange and thus prevented a condition precedent in the Second

Engagement Letter of the payment of $7.5 million to Zama Capital Strategy. *Id.* ¶¶ 92, 152.

Defendants argue that there is no intent or motive element breach of a contract claim and thus

Defendants' alleged motive to prevent UERI's public listing in the U.S. is irrelevant to Plaintiffs'

breach of contract claim. *See* Def. Mem. at 42-43.  But the motive to avoid U.S. legal scrutiny

could have a "tendency to make [Defendants' active prevention of UERI's public listing] more or less probable." *See* Fed. R. Ev. 401; FAC ¶ 208.

Thus, at this stage in the litigation, the Court is not prepared to find that these allegations have a "no possible bearing" on the subject matter of Plaintiffs' claims. Moreover, Defendants "will have ample opportunity after discovery to show that these allegations are baseless or irrelevant to Plaintiffs' claims." *See Lynch v. Southampton Animal Shelter Foundation, Inc.*, 278 F.R.D. 55, 66 (E.D.N.Y. 2011). Certainly, should the case proceed to summary judgment motion practice or trial, Defendants can raise valid objections under the Rules of Evidence. At this stage however, Defendants have not convinced the Court that there is a strong reason to tamper with the pleadings.

## IV.   Motions to Seal

Several motions to seal also are pending before the Court. [ECF Nos. 26, 56, 80, 75, 103]. On March 11, 2024, Defendant UEC filed a letter motion requesting that the Court extend temporary sealing of certain allegations in the Complaint, attaching proposed redactions to the Complaint. *See* [ECF No. 26 ("March 11 Letter")]. UEC argued that portions of the complaint should remain under seal for two reasons. First, UEC argued that several allegations were "immaterial, impertinent, an/or scandalous and thus subject to striking under Fed. R. Civ. P. 12(f)" and thus "pending the outcome of [Defendant's anticipated motion to strike], the 12(f) Material should remain under seal." *See id.* at 1-2. Second, UEC asserted that certain allegations "improperly disclose attorney-client privileged information and/or work product." *See id.* at 1. UEC argued that, during the events described in the Complaint, "Plaintiffs purported to act as agents of UEC," UEC's counsel shared privileged information with Plaintiffs, and allegations in

the Complaint, which disclose those communications, thus improperly disclosed such privileged information. *See id.* at 2.

The Court previously held that "[t]he Complaint shall remain under seal pending the Court's decision on Defendants' letter motion to seal filed on March 11, 2024." [ECF No. 12]. While the March 11 request to seal was pending, Plaintiffs filed under seal the operative Amended Complaint, which thereafter was filed publicly with Defendants' proposed redactions. [ECF Nos. 43-44].[18]  Since then, both UEC Defendants and Plaintiffs filed under seal their briefing on the pending Motion to Dismiss and redacting from the publicly filed version the allegations that Defendants had requested to seal pending the Court's decision on the Defendants' March 11 letter motion to seal. [ECF Nos. 56 & 80].

Hans Van Der Sande, who has since been voluntarily dismissed from this case, also filed two motions to seal accompanying his two motions to dismiss. [ECF Nos. 75 & 103]. Regarding his first motion to dismiss, Van Der Sande requested to file the memorandum in support under seal and publicly in redacted form, pending the Court's decision on the Defendant's March 11 letter. [ECF Nos. 75]. Regarding his second motion to dismiss, Van Der Sande requested to file under seal his memorandum in support as well as the accompanying declaration and exhibits and file them publicly in redacted form because they "contain sensitive, personal information concerning his residence, assets and other aspects of his and his family's professional and personal lives in Japan." [ECF No. 103].  After Mr. Van Der Sande was voluntarily dismissed from the case, the remaining parties were ordered to advise the Court of their position on his outstanding motions to seal. [ECF No. 109].  The parties submitted a letter, which included the position of non-party Mr. Van Der Sande. [ECF No. 114].

---

[18] Defendants filed no additional request to seal the Amended Complaint; however, the Court construes the March 11 request to seal to apply to both the Complaint and the Amended Complaint.

The Court has denied Defendants' motion to strike and thus all requests to seal and file in redacted form pending such a decision are DENIED as moot. *See* [ECF Nos. 26, 56, 80, 75]. Remaining before the Court are (1) UEC's request to seal certain allegedly privileged communications disclosed in the Complaint and Amended Complaint and (2) Mr. Van Der Sande's request to seal certain personal information in his motion to dismiss.

There are three steps for evaluating whether a document should be made available to the public under the common law right of public access: first, determine whether the information to be sealed is a "judicial document" to which the presumption of public access applies; second, determine the "weight of the presumption"; and third, "balance" competing factors against "the weight properly accorded the presumption of access." *See Mirlis v. Greer*, 952 F.3d 51, 59 (2d Cir. 2020); *Jimenez-Fogarty v. Fogarty*, No. 1:24-CV-08705 (JLR), 2024 WL 5039666, at *1 (S.D.N.Y. Dec. 9, 2024) (quoting *United States v. Amodeo (Amodeo II)*, 71 F.3d 1044, 1050 (2d Cir. 1995)); *see also Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008) (holding that in determining whether to allow a plaintiff to proceed under a pseudonym the question for the court is whether the plaintiff has a "substantial privacy" interest that "outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings.")

A strong presumption of public access attaches to judicial documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006). Judicial documents are those "relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 119 (quoting *United States v. Amodeo (Amodeo I)*, 44 F.3d 141, 145 (2d Cir. 1995)). If a document is a judicial document, courts must consider whether the presumption of access is a common law right of access or a heightened "qualified First Amendment right to attend judicial proceedings and to access certain judicial documents." *Id.* at 120 (quoting *Hartford Courant Co. v. Pellegrino*,

380 F.3d 83, 91 (2d Cir. 2004)).  If the more stringent First Amendment framework applies, "[d]ocuments may be sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* (quoting *In re N.Y. Times Co.*, 828 F.2d 110, 113 (2d Cir. 1987)).  General concerns of privacy and the desire to avoid embarrassment do not outweigh the presumption of access to the docket.  *See Zabolotsky v. Experian*, No. 19-CV-11832 (GHW), 2021 WL 106416, at *2 (S.D.N.Y. Jan. 12, 2021); *see also United States v. Martoma*, No. 12-cr-973 (PGG), 2014 WL 164181, at *5 (S.D.N.Y. Jan. 9, 2014) (noting that "[t]he mere fact that judicial records may reveal potentially embarrassing information is not in itself sufficient reason to block public access" (quoting *Siedle v. Putnam Invs.*, Inc., 147 F.3d 7, 10 (1st Cir. 1998))).

The Court first addresses UEC's motion to seal purportedly privileged material detailed in the complaints.  First, the Complaint and Amended Complaint are judicial documents. *Bernstein*, 814 F.3d at 140. As the Second Circuit has explained, "[a] complaint, which initiates judicial proceedings, is the cornerstone of every case, the very architecture of the lawsuit, and access to the complaint is almost always necessary if the public is to understand a court's decision." *Id.* (quoting *Fed. Trade Comm'n v. Abbvie Prods. LLC*, 713 F.3d 54, 62 (11th Cir. 2013)).  The 12(b)(6) motion at issue here is entirely dependent on the legal sufficiency of the Plaintiffs' pleadings and are thus centrally relevant to this Court's judicial function. *See Ello v. Singh*, 531 F. Supp. 2d 552, 584 (S.D.N.Y. 2007), *as amended* (Nov. 13, 2007).  Furthermore, pleadings in a case trigger the presumptive right of access under both the common law and the First Amendment. *See Bernstein*, 814 F.3d at 141.

Second, the weight of that presumptive right of access is considerable, for the reasons stated above and because, without access to the Amended Complaint, the public would be unable

to assess the correctness of the judge's decision. *Lugosch,* 435 F.3d at 120; *see also Ello*, 531 F. Supp. 2d at 584.

Third, the competing considerations do not outweigh the presumptive right of access to the Complaint and Amended Complaint.  In support of its argument to seal allegedly privileged material in the complaint, UEC makes the conclusory statement that "at all times during Plaintiffs' engagements with UEC, Plaintiffs purported to act as agents of UEC" and as such had access to UEC privileged information.   *See* March 11 Letter at 2.  Defendants also assert that communications from UEC's attorneys to Plaintiffs did not waive UEC's attorney-client privilege "as UEC and its affiliates were acting on the understanding that Plaintiffs were within the scope of that privilege." *See* March 11 Letter at 2 (citing *CSC Recovery Corp. v. Daido Steel Co.*, 1997 WL 661122, at *3 (S.D.N.Y. Oct. 22, 1997).  Plaintiff disputes both of these assertions. [ECF No. 27 at 3].

UEC has not established that Plaintiffs were agents of UEC, whether express or implied. Under New York law, an express agency is created through (1) "the principal's manifestation of intent to grant authority to the agent," (2) "agreement by the agent," and (3) the principal's "control over key aspects of the undertaking." *See Com. Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003) (collecting cases). Where there is no "actual" authority, an implied agency is created where the principal's conduct, "reasonably interpreted, causes third parties to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *See Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 274 (S.D.N.Y. 2016) (quoting *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 703 (2d Cir.1990)). UEC does not claim that it expressly granted Zama the authority to act as its agent. *See* March 11 Letter at 2. Instead, it conclusorily states without support that "[a]t all times

during Plaintiffs' engagements with UEC, Plaintiffs *purported* to act as agents of UEC." *See id.* (emphasis added). Moreover, UEC has not established that the information shared with Zama by UEC's attorneys was in fact privileged. To the extent UEC or its attorneys did share reiviileged information with Plaintiffs, UEC waived any privilege that otherwise attached. *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 628, 57 N.E.3d 30, 37 (N.Y. 2016) (there is a general rule that "communications made in the presence of or to a third party are not protected by the attorney-client privilege."). Based on the record before it, the Court cannot make the necessary "specific . . . findings" that sealing is essential to preserve higher values and is narrowly tailored to serve that interest." *See Lugosch*, 435 F.3d at 124.

Finally, the Court addresses non-party Van Der Sande's remaining motion to seal personal information in the papers supporting his motion to dismiss. [ECF No. 103 ("Van Der Sande Mot.")]. Van Der Sande requests leave to file under seal his memorandum of law, declaration, and attached Exhibits D through W filed in support of his second motion to dismiss and file a publicly available redacted version of the memorandum of law. *Id.* (citing [ECF Nos. 91-101]). He seeks to seal these documents because they contain personal information concerning his residence, real estate assets, utility payments, legal residence status in Japan and details regarding his and his family's professional and personal lives. *Id.*; [ECF No. 100]. Although the Second Circuit has held that pleadings maintain their status as judicial documents even in settled cases, *see Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 140 (2d Cir. 2016), it has not yet addressed whether this principle extends beyond pleadings. *See Sabre Glob. Techs. Ltd. v. Hawaiian Airlines*, No. 22-CV-7395 (VSB), 2024 WL 838044, at *1 (S.D.N.Y. Feb. 28, 2024). Courts in this district disagree as to whether documents supporting pending motions that will not be resolved by the Court due to a settlement of the parties maintain their status as judicial

documents. *Compare Universal Ent. Corp. v. Eiseman*, No. 23 CIV. 2250 (LGS), 2024 WL 2815995, at *2 (S.D.N.Y. May 31, 2024) (exhibits to an unadjudicated motion in a case that has been resolved, are not "judicial documents) *and Giuffre v. Maxwell*, No. 15 CIV. 7433 (LAP), 2020 WL 133570, at *2 (S.D.N.Y. Jan. 13, 2020) (finding motion papers were not judicial documents when they were uncontested and mooted by settlement of the parties) *with Doe 1 v. JP Morgan Chase Bank, N.A.*, No. 22-CV-10019, 2024 WL 3597196, at *3 (S.D.N.Y. July 30, 2024) (motions mooted by settlement are judicial documents because they could potentially be relevant to judicial function) *and Lohnn v. IBM*, 2022 WL 3359737, at *4 (S.D.N.Y. Aug. 15, 2022) (holding motions mooted by settlement are judicial documents).

Here, the Court would grant the sealing motion regardless of whether the documents in support of Van Der Sande's motion are judicial documents. If they are not judicial documents, there is no presumption for public access. *Universal Ent. Corp.*, No. 23 CIV. 2250 (LGS), 2024 WL 2815995, at *2. If they are judicial documents, the presumption for public access is low because the Court will not render a decision on the motion to dismiss since it is mooted by Plaintiffs dismissal of all claims against Van Der Sande. *See* [ECF No. 108]; *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) ("The weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."); *Amodeo II*, 71 F.3d at 1050 ("Where testimony or documents play only a negligible role in the performance of Article III duties, the weight of the presumption is low"). As such there is not a strong public interest in access to documents so that it may monitor judicial decision-making. *See Sabre Glob. Techs.*, No. 22-CV-7395 (VSB), 2024 WL 838044, at *2; *Lohnn*, No. 21-CV-6379 (LJL), 2022 WL 3359737, at *5.

Where the weight of the presumption to public access is low, it "amounts to little more than a prediction of public access absent a countervailing reason." *Amodeo II*, 71 F.3d at 1050. Here, there is a countervailing interest in maintaining a non-party's privacy interest that weighs heavily in favor of sealing. *See id.* (reiterating that "the privacy interests of innocent third parties ... should weigh heavily in a court's balancing equation"); *Mirlis v. Greer*, 952 F.3d 51, 61 (2d Cir. 2020) ("Foremost among the competing concerns that a court weighing disclosure must consider is 'the privacy interest of the person resisting disclosure.'"); see *also In re IBM Arb. Agreement Litig.*, No. 21-CV-6296 (JMF), 2022 WL 3043220, at *3 (S.D.N.Y. Aug. 2, 2022), *aff'd*, 76 F.4th 74 (2d Cir. 2023) (finding the privacy interests of third parties outweigh the presumption of public access to an opposition to a previously granted motion to dismiss). Moreover, the information that Van Der Sande seeks to seal—details about his family life, his assets, his legal residence— are "traditionally considered private rather than public." *Amodeo II*, 71 F.3d at 1051 (holding that information like "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public."). Accordingly, Mr. Van Der Sande's motion to seal only the "sensitive, personal information" in the supporting papers of his second motion to dismiss is granted.  [ECF No. 103].

## CONCLUSION

For the foregoing reasons, the Motion by Defendants UEC, UERI, TRA, and TRLEI to Dismiss is GRANTED IN PART AND DENIED IN PART.  IT IS HEREBY ORDERED that because the Court does not have personal jurisdiction over Defendant TRA, all claims asserted against it are DISMISSED WITH PREJUDICE.  IT IS FURTHER ORDERED that all claims against UEC *except* the breach of contract claims brought by Zama Capital Advisors and Zama

Capital Strategy, respectively, are DISMISSED WITH PREJUDICE for failure to state a claim. IT IS FURTHER ORDERED that the claim for breach of the RRA against UERI is DISMISSED WITH PREJUDICE for lack of personal jurisdiction and all other claims brought against UERI are DISMISSED WITH PREJUDICE for failure to state a claim. IT IS FURTHER ORDERED that all claims brought against TRLEI *except* the tortious interference with a contract claim by Zama Capital Strategy predicated on UEC's alleged prevention of UERI's listing on a U.S. exchange are DISMISSED WITH PREJUDICE for failure to state a claim.

IT IS FURTHER ORDERED that UEC Defendants' motion to strike is DENIED. Mr. Van Der Sande's motion to seal "sensitive, personal information" in the supporting papers of his second motion to dismiss is GRANTED, and all other pending motions to seal are DENIED.

The Clerk of Court is respectfully requested to close the motions at docket numbers 26, 53, 56, 67, 75, 80, and 103.

**SO ORDERED.**

**Date:  March 31, 2025**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**