USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/9/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZAMA CAPITAL ADVISORS LP and ZAMA
CAPITAL STRATEGY ADVISORS LP,

          Plaintiffs,

-against-

UNIVERSAL ENTERTAINMENT
CORPORATION, UE RESORTS
INTERNATIONAL, INC. f/k/a OKADA MANILA
INTERNATIONAL, INC., TIGER RESORT ASIA
LIMITED, TIGER RESORT, LEISURE AND
ENTERTAINMENT, INC., and BYRON YIP,

          Defendants.

1:24-cv-01577-MKV

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SANCTIONS**

MARY KAY VYSKOCIL, United States District Judge:

Before the Court is the motion by Defendants Universal Entertainment Corporation

("UEC") and Tiger Resort, Leisure and Entertainment, Inc. ("TRLEI") (collectively "Defendants")

for sanctions against Plaintiffs Zama Capital Advisors LP ("ZCA") and Zama Capital Strategy

Advisors LP (collectively "Plaintiffs") for Plaintiffs' cancellation of a mediation scheduled for

September 18, 2025, roughly one hour before it was set to commence. [ECF No. 173]. For the

reasons set forth below, Defendants' motion for sanctions is GRANTED in part and DENIED in

part.

## BACKGROUND

In accordance with this Court's Case Management Plan [ECF No. 134], the parties

informed the Court that they had "participated in a one-hour in-person [preliminary] meeting

[regarding settlement]" and that they desired to move forward with a privately retained mediator.

[ECF No. 137]. Thereafter, the parties retained Greg A. Danilow, a private mediator from Phillips

ADR Enterprises, P.C. ("PADRE"). [ECF No. 176, Declaration of Daniel M. Perry ("Perry Decl.")

1

at ¶ 2].  On August 21, 2025, PADRE confirmed that a mediation session was scheduled for September 18, 2025, at 9:00 a.m. at the New York office of Plaintiff's former counsel, Quinn Emanuel Urquhart & Sullivan, LLP.  *Id.* at ¶¶ 3-4.  UEC paid a $25,000 non-refundable flat fee to PADRE for the mediation.  [ECF No. 175, Declaration of Nobuki Sato ("Sato Decl.") at ¶ 2].

At the mediator's request, the parties exchanged mediation statements and responses to those statements.  Perry Decl. at ¶ 5.  In addition, Defendants arranged for two senior executives— Hans Van Der Sande (TRLEI's Chief Financial Officer ("CFO")) and Nobuki Sato (UEC's CFO and TRLEI's recently appointed President)—to travel to New York to attend the mediation with settlement authority subject to approval from the respective board of directors.  Sato Decl. at ¶¶ 3-7.  Hans Van Der Sande flew from Manila, Philippines, and Nobuki Sato flew from Tokyo, Japan. The two executives both returned to Tokyo on September 19, 2025.  *Id.*  In total, the two executives incurred $29,790.51 in travel expenses for the mediation.  *Id.* at ¶¶ 4, 6.

At 7:53 a.m. on September 18, 2025—one hour and seven minutes before the scheduled mediation—Plaintiffs' counsel e-mailed Defendants that the mediation could not go forward, writing:

> A conflict has arisen that I believe requires me to withdraw from my representation of the Plaintiffs in connection with the mediation scheduled for today, and, as a result, the mediation will not be able to go forward. I will follow up as soon as I am able to concerning the ongoing litigation as a whole.
> I apologize for the timing of this email, and for any inconvenience for those who have traveled from Asia to attend.

[ECF No. 176-1 ("Perry Decl., Ex. A")].

Thereafter, on October 6, 2025, Plaintiffs' counsel, Donald Reinhard, filed a motion to withdraw as attorney for Plaintiffs.  [ECF No. 171].  In Mr. Reinhard's declaration in support of his motion to withdraw, he states that "immediately" after he had informed Defendants of the conflict that required cancellation of the September 18 mediation, Plaintiffs "informed [him] that

2

they would be taking efforts to resolve the conflict[.]" [ECF No. 171-1 at ¶¶ 4-5]. However, the efforts were ultimately unsuccessful and the conflict between "Plaintiffs and their principals" remained as of October 6 such that Mr. Reinhard determined withdrawal was required. *Id.* at ¶ 5.

With leave of Court, Defendants filed their motion for sanctions, supported by a memorandum of law ("Mem.") [ECF No. 174], and attached declarations from Nobuki Sato [ECF No. 175], and Daniel M. Perry [ECF No. 176]. Plaintiffs filed their opposition ("Opp'n") [ECF No. 183]. In turn, Defendants filed a reply ("Reply") [ECF No. 187], with an attached supplemental declaration from Daniel M. Perry ("Supp. Perry Decl.") [ECF No. 188].

In a footnote, Plaintiffs' opposition states, without more, that "certain additional information" concerning the conflict among Plaintiffs' principals "may also now be found in public filings in *Eiseman v. Gomez-Villalva Garcia*, Index No 659115/2025 (Sup. Ct., N.Y. Cnty. Oct. 15, 2025)." Opp'n at 8 n.4. After carefully reviewing the state court lawsuit that was filed October 15, 2025—after the scheduled mediation in this case—it is clear that the allegations therein depict a profound dispute over control of various Zama entities between Alexander Eiseman and Emilio Gomez-Villalva Garcia—the only two principals of Plaintiff ZCA in this action.[1] The allegations make clear that the dispute among the principals did not arise the morning of the scheduled mediation but rather can be traced as far back as ***July 2024*** when the two principals disagreed over how to resolve a booking error. [ECF No. 188-1 ("Zama State Court Complaint") at 11-12]. The dispute allegedly led Eiseman to send Gomez-Villalva "a formal notice of breach of the Zama GP Agreement" and, in turn, Gomez-Villalva directed Zama service providers to cease work on

---

[1] Per documents attached to the state court complaint, Zama Capital Partners LLC, which is not a party in this case, is the general partner that has "full, exclusive, and complete discretion in the management and control of" Plaintiff ZCA. *See* Reply at 4 (citing ECF No. 188-2 at 5). Zama Capital Partners, LLC is made up of two managers—Eiseman and Gomez-Villalva—who have "exclusive control of the management" of Zama Capital Partners, LLC. [ECF No. 188-2 at 12].

correcting the booking error.  Zama State Court Compl. at 12-13.  According to the Zama State Court Complaint, ultimately, on October 11, 2024, Zama's fund administrator terminated services to Zama.  *Id.* at 12.[2]  It is further alleged that Gomez-Villalva's alleged obstruction was ongoing up to the date of the filing of the state court complaint.  *Id.* at 13.

According to the Zama State Court Complaint, the dispute came to a head in August 2025—roughly a month before the cancelled mediation here—as the two principals clashed over the control of various Zama entities.  In particular, the two men allegedly clashed over Gomez-Villalva's decision to take a position at an unrelated company and which of them had authority to hire vendors and service providers for Zama.  *Id.* at 13-16.  For example, Eiseman claimed that Gomez-Villalva was "tortiously interfer[ing]" with Zama's business relationships, while Gomez-Villalva accused Eiseman of issuing "unauthorized" payments to a certain vendor in order to "establish and entrench individual control of the Zama fund structure, in clear violation of the relevant governing documents and in derogation of Gomez-Villalva's co-equal governance rights."  *Id.* at 14.

The Zama State Court Complaint also notes that Plaintiffs' counsel in the action pending before this Court had to withdraw on September 18, 2025, but does not otherwise specify when the conflict first arose.  *Id.* at 18.  The complaint does make clear that the conflict arose from the long simmering dispute between Eiseman and Gomez-Villalva.  *Id.* at 18-19 (noting "Gomez-Villalva's pattern of tortiously interfering with Eiseman's ability to make decisions on behalf of and to benefit the Zama entities" including Plaintiff ZCA in this action).

---

[2] According to the Zama State Court Complaint, the replacement fund administrator later terminated its services as well given the dispute between the two principals in August 2025.  *Id.* at 13-14.

On October 30, 2025, this Court conducted a status conference. Counsel for both Plaintiffs and Defendants were present as was Eiseman.[3] [ECF No. 194]. At the conference, the Court provided Plaintiffs with further notice of the possible imposition of sanctions and even advised the parties of its preliminary thinking as to Defendants' Motion for Sanctions. [ECF No. 194]. However, in the interest of due process and to ensure Plaintiffs had an adequate opportunity to be heard, the Court ordered supplemental briefing from Plaintiffs and Defendants further addressing the motion for sanctions. [ECF No. 194].

The Court is now in receipt of Plaintiff's Supplemental Brief in Further Opposition to Defendants' Motion for Sanctions ("Suppl. Opp'n") [ECF No. 195], and the attached supplemental declaration of Donald Reinhard ("Suppl. Reinhard Decl.") [ECF No. 196]. The Court is also in receipt of Defendants' later-filed Supplemental Memorandum of Law ("Suppl. Mem.") [ECF No. 198], and the attached second supplemental declaration of Daniel M. Perry ("Second Suppl. Perry Decl.") [ECF No. 199].

In their Memorandum of Law, Defendants initially requested (1) an award of attorneys' fees incurred in connection with the September 18 mediation ($177,249.34) and in drafting the pre-motion letter for leave to file a motion for sanctions filed at ECF No. 165 ($33,413.33); (2) expenses incurred in preparation for the mediation, namely a $25,000 non-refundable flat fee to PADRE and $29,790.51 in travel expenses for the executives who traveled to New York from Asia to participate in the mediation; and (3) an order mandating that any future mediation takes place in either Manila, Philippines or Tokyo, Japan.[4]  Mem. at 4, 7-8. Defendants also requested

---

[3] At the conference, counsel for Plaintiffs indicated that on October 22, 2025, Gomez Villalva and Eiseman reached a resolution in the state court action and that Gomez-Villalva is no longer associated with Plaintiffs. [ECF No. 203 at 3].

[4] As the Court explained at the October 30 Status Conference and again in the Post-Conference Order, the Court declines to order that any mediation occur in Manila, Philippines or Tokyo, Japan. [ECF No. 194].

attorneys' fees incurred in connection with "this motion practice," but did not otherwise specify the amount sought. Mem. at 8. In their Supplemental Memorandum of Law, Defendants abandon their request for attorney's fees in connection with the mediation ($177,249.34), reiterate their request for travel expenses, the PADRE fee, and attorneys' fees for the pre-motion letter, and additionally request an award of $157,669.71 in attorneys' fees incurred in connection with preparing their Motion for Sanctions, Memorandum of Law, Reply, and the related declarations in support. Suppl. Mem. at 3 & n.3. Defendants have now submitted documentation to support these requested fees. *See* Second Suppl. Perry Decl. Because Plaintiffs had not had an opportunity to challenge the basis for Defendants' request for $191,083.05 in attorneys' fees ($157,669.71 in attorneys' fees incurred in connection with the filing of the Motion for Sanctions and $33,413.33 for the Pre-Motion Letter), the Court ordered additional briefing on Defendants' request for those attorneys' fees and costs. The Court is now in receipt of Plaintiffs Supplemental Memorandum in Opposition to Defendants' Request for Attorneys' Fees ("Second Suppl. Opp'n") [ECF No. 202], and Defendants Supplemental Reply ("Suppl. Reply") [ECF No. 205].

## LEGAL STANDARD

"[A] district court has inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons." *Sassower v. Field*, 973 F.2d 75, 80–81 (2d Cir. 1992) (affirming sanction pursuant to inherent authority for "entirely vexatious and oppressive tactics engaged in by plaintiffs"). The Second Circuit has made clear that "a court's inherent power allows it to impose monetary sanctions against a litigant (or its counsel) for misconduct" and that such an award "vindicate[s] judicial authority," and makes "the wronged party 'whole for expenses caused by his opponent's obstinacy.'" *Int'l Techs. Mktg., Inc. v. Verint Sys. Ltd.*, 991 F.3d 361, 367 (2d Cir. 2021) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46

6

(1991)); *see also Walpert v. Jaffrey*, 127 F. Supp. 3d 105, 122 (S.D.N.Y. 2015) ("[F]ederal courts have the inherent power to sanction a party for conduct that constitutes an abuse of the judicial process.") (citation omitted).  Sanctions pursuant to a court's inherent authority are appropriate "only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009).

Pursuant to its inherent authority, a district court may impose sanctions in the form of attorneys' fees as well as costs and expenses to the harmed party.  *See Chambers*, 501 U.S. at 45-46; *see also Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 135-36, 141-42 (2d Cir. 2023) (affirming monetary sanction pursuant to the district court's inherent authority of "attorneys' fees, costs, and expenses" on plaintiff).  A district court may also award attorneys' fees incurred for litigating the underlying sanctions motion.  *See Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 148–49 (2d Cir. 2012) (upholding imposition of fees for litigation of sanctions motion pursuant to 28 U.S.C. § 1927 and inherent powers); *see also Liebowitz v. Bandshell Artist Mgmt.*, 6 F.4th 267, 285-87 (2d Cir. 2021).  Nonetheless, a district court has "considerable discretion in determining the amount of sanctions to award." *In re Plumeri*, No. 10-10050 (MG), 2010 WL 3087685, at *4 (Bankr. S.D.N.Y. Mar. 25, 2010), *aff'd*, 434 B.R. 315 (S.D.N.Y. 2010); *see also Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 235 (2d Cir. 2020) ("The imposition of sanctions pursuant to a court's inherent authority is truly discretionary.").  However, "a district court may not impose attorney's fees as a sanction without first making an explicit finding that the sanctioned party, whether a party or a party's counsel, acted in bad faith in engaging in the sanctionable conduct." *Rossbach,* 81 F.4th at 142 (quoting *Wilson v. Citigroup, N.A.*, 702 F.3d 720, 724 (2d Cir. 2012) (per curiam)).

Lastly, due process requires that before imposing any sanctions a party must receive "specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on the matter, and must be forewarned of the authority under which sanctions are being considered, and given a chance to defend himself against specific charges." *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999) (quoting *Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir.1997)).

## DISCUSSION

### A.  Notice And Opportunity to Be Heard

As detailed above, Plaintiffs have received adequate notice and have had multiple opportunities to be heard concerning the possible imposition of sanctions pursuant to this Court's inherent authority for their late cancellation of the mediation.  *See Schlaifer Nance*, 194 F.3d at 334. Plaintiffs do not argue otherwise.

### B.  Sanctions Are Appropriate Pursuant to the Court's Inherent Authority

Defendants argue that Plaintiffs' inexcusably late cancellation based on a plainly foreseeable conflict reflects gross indifference to the costs expended in preparing for the mediation that amounts to "bad faith."  Mem. at 4-6; Reply at 1-2.  Defendants point to several cases where sanctions were imposed on parties that failed to attend or acted in bad faith at a scheduled mediation.  Mem. at 4-5 (citing *Acosta v. Am. LaFrance, LLC*, No. 14-CV-881A(F), 2016 WL 9753965 (W.D.N.Y. May 10, 2016); *Fisher v. SmithKline Beecham Corp.*, No. 07–CV–0347A(F), 2008 WL 4501860 (W.D.N.Y. Sep. 29, 2008); *Ushershon v. Bandshell Artist Mgmt.*, 19-CV-6368 (JMF), 2020 WL 3483661 (S.D.N.Y. June 26, 2020)).

Plaintiffs counter that the late cancellation was not done in bad faith but rather was the "unfortunate and necessary result of [the conflict among Plaintiffs that arose] during preparations

8

for the mediation that required counsel to withdraw from the representation." Opp'n at 8. Plaintiffs assert the conflict arose only on September 18 and state, without more, that "additional information may also now be found in public filings in *Eiseman v. Gomez-Villalva Garcia*, Index No 659115/2025 (Sup. Ct., N.Y. Cnty. Oct. 15, 2025)." Opp'n at 8 n.4. Further, Plaintiffs attempt to distinguish several of Defendants' cited cases and correctly note that Defendants' cases concerned sanctions for failing to appear and/or participated in bad faith at a ***court ordered*** mediation, which is not the case here since the Court did not order the mediation. *Id.* at 8-9.

In their reply, Defendants argue that the long-running dispute between Plaintiffs' principals that is recounted in the Zama State Court Complaint demonstrates that Plaintiffs "knew or should have known of the conflict well before 7:53 a.m. on the morning of" the September 18, 2025 mediation. Reply at 1-2, 7-8. Defendants counter that accordingly Plaintiffs acted in bad faith when they agreed to participate in the mediation knowing full well that their internal conflict could "render all of the time and expense associated with the mediation wasted." *See* Reply at 9. In their supplemental brief, Plaintiffs shift tact and acknowledge there had been "ongoing business disputes between Plaintiffs' principals" but claim the principals were always aligned concerning ***this*** litigation. Suppl. Opp'n at 2-3. Plaintiffs claim the principals' dispute only affected this litigation on the evening of September 17. *Id.*

After carefully reviewing the parties' sanctions-related submissions, the Court finds that sanctions are warranted against Plaintiffs, but not Plaintiffs' counsel. Plaintiffs' contention that they discovered a conflict among its principals that required cancellation of the mediation a mere ***67 minutes*** beforehand is simply not credible. The source of the conflict—disputes between Eiseman and Gomez-Villalva—had been readily apparent to the Plaintiffs themselves for at least a month, if not over one year, prior to the scheduled mediation. As recounted above, by mid-

9

August 2025, the dispute had culminated in an irreconcilable conflict over who between the two principals had control over the various Zama entities. Even if the Court were to credit Plaintiffs' claim that they were aligned with respect to this litigation until September 17 (Suppl. Opp'n at 2-3), the underlying dispute over control, which pre-dated the decision to engage PADRE, directly implicated Plaintiffs authority to enter into any settlement agreement. As such, Plaintiffs either should not have agreed to mediation or they should have timely disclosed their evident conflict, which impacted their ability to meaningfully participate in any mediation, to Defendants so that Defendants could determine for themselves whether they wanted to pursue mediation in such circumstances.

Instead, despite being aware of the costs and expenses Defendants would incur as well as Defendants need to make travel arrangements in connection with the mediation, Plaintiffs never alerted Defendants of their obvious conflict and instead allowed significant money to be expended by Defendants to prepare for a mediation. Such behavior is vexatious and an oppressive tactic. By their conduct, Plaintiffs caused Defendants "to unnecessarily incur expenses for no good reason" when the mediation was cancelled as a result of that conflict. *Fisher v. SmithKline Beecham Corp.*, No. 07-CV-0347A(F), 2008 WL 4501860, at *7 (W.D.N.Y. Sept. 29, 2008) (sanctioning party and counsel pursuant to inherent authority for surprising opposing party with a summary judgment motion the day before a scheduled mediation, which derailed the mediation, and caused unnecessary expense on opposing party who travelled and prepared for the mediation). Plaintiffs' decision to pursue mediation despite knowing full well that the internal conflict amongst its principals would almost certainly render the mediation a waste (which turned out to be the case) is vexatious, wanton, oppressive, is abusive of the judicial process, and amounts to bad faith. *See id.*; s*ee also Acosta. Am. LaFrance, LLC*, No. 14-CV-881A(F), 2016 WL 9753965, at *3 (W.D.N.Y.

May 10, 2016) ("[T]he failure of Plaintiffs' counsel, Napoli Bern, to timely inform Defendants (and the mediator) of the likely need to cancel the mediation because of the uncertainties regarding Plaintiffs' representation . . . constituted a gross indifference to the foreseeable costs, such as long-distance air travel, Defendant's attorneys would necessarily incur in preparing to attend the mediation, amounting to bad faith[.]"); *cf. Chen v. Marvel Food Servs., LLC*, No. CV 15-6206 (JMA) (AYS), 2016 WL 6872626, at *5 (E.D.N.Y. Nov. 21, 2016) (finding plaintiff acted in bad faith and imposing sanctions pursuant to Federal Rule of Civil Procedure 16(f) where plaintiff "doubled the offer that he conveyed" to defense counsel "just minutes before" a settlement conference rendering the parties unprepared to participate in the conference).  Plaintiffs argue that *Acosta* and *Fisher* are inapposite because those cases dealt with court-ordered mediations and sanctions under Rule 16.  Opp'n at 8-9.  However, the reasoning of those courts, as well as *Chen*, finding that analogous conduct amounted to bad faith is persuasive and applicable to the unique facts here.  Moreover, the court in *Fisher* specifically found that that the imposition of sanctions for a party's bad faith derailment of a mediation was appropriate pursuant to the court's inherent power.  2008 WL 4501860, at *4, *6.

Accordingly, Plaintiffs' vexatious conduct is sanctionable under this Court's inherent authority to "make the [Defendants] whole for expenses caused by [their] opponent's obstinacy." *Int'l Technologies*, 2022 WL 11280876, at *4 (alterations added).

## C. Appropriate Sanction Award

Having found that the imposition of sanctions is appropriate given Plaintiffs' vexatious and bad faith conduct, the Court must determine the appropriate sanction to be imposed.  Sanctions under a Court's inherent authority "must be exercised with restraint and discretion." *Chambers*,

501 U.S. at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44-45.

### i.    Nonrefundable Mediation Fee and Travel Expenses

The Court finds that awarding Defendants the $29,790.51 in travel expenses that its executives incurred as well as the $25,000 non-refundable fee UEC paid to PADRE for the mediation is unquestionably and wholly warranted. Both expenses were rendered a complete nullity and were plainly foreseeable by Plaintiffs. Moreover, "but for" Plaintiffs' misconduct, Defendants could have avoided these expenses. *Liebowitz*, 6 F.4th at 288; *see also Fisher*, 2008 WL 4501860 at *7.

### ii.    Attorneys' Fees

Defendants, who are represented by Milbank LLP, request $191,083.05 in legal fees incurred in preparing its sanctions-related submissions—specifically $33,413.33 in fees incurred in connection with researching and drafting the pre-motion letter filed at ECF No. 165 and $157,669.71 in fees incurred in drafting the Motion for Sanctions, the Memorandum of Law in support, and the Reply. Suppl. Mem. at 3 & n.3. In support, Defendants filed a second supplemental declaration of Daniel M. Perry, which details the methodology for calculating the requested fees, as well as the hourly rates for the seven attorneys who worked on the sanctions related submissions (two partners and five associates). *See generally* Second Supp. Perry Decl. Defendants also attached redacted versions of the September and October bills submitted to their client which details the hours expended and nature of the work done by each attorney on sanctions-related work. *See* Second Supp. Perry Decl. at Ex. I (September 2025 Bill), Ex. J (October 2025 Bill). Plaintiffs challenge the propriety of the requested attorneys' fees. *See* Second Suppl. Opp'n.

Plaintiffs first argue that Defendants have waived their request for the $157,669.71 in attorneys' fees incurred in connection with its sanctions application because Defendants raised this request for the first time in supplemental briefing ordered by the Court. Second Suppl. Opp'n at 2-3. However, as noted above, Defendants did request "attorneys' fees incurred in connection with this motion practice" in their opening Memorandum of Law, *see* Mem. at 7-8, albeit without supporting documentation. Thus, Defendants have not waived this request.

Next, Plaintiffs argue that the attorneys' fees were not incurred due to their bad faith because Defendants "made a conscious decision to embark upon motion practice and did not pursue any alternatives." Second Supp. Opp'n at 3-4. However, Plaintiffs cite no authority for this argument and ignore authority permitting recovery of attorneys' fees to litigate sanctions motions. *See, e.g.*, *Enmon*, 675 F.3d at 148. Indeed, the Second Circuit has expressly permitted recovery of the cost of litigating only a partially successful motion for sanctions. *See Liebowitz*, 6 F.4th at 288. Moreover, Plaintiffs omit the fact that they challenged Defendants' motion for sanctions making clear that pursuit of alternative resolution would have been unavailing.[5] As such, the Court concludes that some award of attorneys' fees incurred in connection with the Defendants' motion for sanctions is appropriate in this case.

Finally, Plaintiffs challenge the reasonableness of Defendants' request, largely arguing that Defendants failed to specify the amount of hours each of Defendants' attorneys billed, failed to detail that all of the requested fees were incurred in connection with the Motion papers given Defense counsel engaged in block billing at times, and that Defense counsel billed for an excessive

---

[5] The Court notes that Plaintiffs offered to reimburse Defendants' travel expenses and the non-refundable flat fee to PADRE in order to resolve the pending Motion for Sanctions. Suppl. Mem. at 5. However, as Defendants point out, that offer was only made after the initial round of briefing and after this Court indicated its preliminary thinking at the October 30 status conference. *See* Suppl. Mem. at 5.

13

amount of time based on the underlying work. Second Suppl. Opp'n at 4-5. These arguments have more merit.

A district court "enjoys broad discretion in determining the amount of a fee award." *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 307 (2d Cir. 2011). "When evaluating attorney's fees, a court must determine whether the proposed fees are 'reasonable,' based on 'a reasonable hourly rate and the reasonable number of hours required by the case.'" *Usherson*, 2020 WL 3483661, at *20 (quoting *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011)). Defendants bear the burden of "documenting the hours reasonably spent by counsel, and the reasonableness of the hourly rates claimed." *Beijing Daddy's Choice Sci. & Tech. Co. v. Pinduoduo Inc.*, No. 18 CIV. 6504 (NRB), 2020 WL 729518, at *6 (S.D.N.Y. Feb. 13, 2020) (citation omitted). With this in mind, the reasonableness of Defendants' hourly rates and hours billed are addressed in turn.

In determining a reasonable hourly rate, courts engage in "a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel," which may "include judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." *Beijing Daddy's*, 2020 WL 729518, at *6. Where, like here, the fees sought "are not hypothetical amounts" but rather are "embodied in invoices prepared as the litigation progressed" the "negotiation and payment of [those] fees by sophisticated clients are solid evidence of their reasonableness in the market." *Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*, 212 F. Supp. 2d 226, 230 (S.D.N.Y. 2002). Here, Defendants' hourly rates for associates range from $716 for an associate from the class of 2024 to $1,168 for an associate from the class of 2019. Second Suppl. Perry Decl. at 4. Defendants' hourly rates for partners range from $1,712 to $1,980. *Id.* Plaintiffs do not contest the reasonableness of

14

these rates.  In any event, the Court concludes that, while high, these rates are roughly comparable to rates at similarly sized firms in New York City, which other courts have been found reasonable. *See Oakley v. MSG Networks, Inc.*, No. 17-CV-6903 (RJS) (RFT), 2025 WL 3041936, at \*6-7 (S.D.N.Y. Oct. 31, 2025) (approving hourly rates of $1250 to $1709 for partners and $374 to $1135 for associates); *see also An v. Despins*, No. 22-CV-10062 (VEC) (JW), 2024 WL 1157281, at \*2-4 (S.D.N.Y. Mar. 18, 2024) (approving hourly rates of up to $895 for associates in 2023 and up to $1,990 for partners in 2024), *appeal dismissed*, No. 24-914, 2024 WL 4524742 (2d Cir. Aug. 13, 2024).  Further supporting the reasonableness of these rates is the fact that the fees requested were paid by a sophisticated client.  *See Beijing Daddy's*, 2020 WL 729518, at \*6.

Determining the reasonableness of hours expended is "committed to the discretion of the district court" and a district court should rely on its familiarity and experience with the case as well as "the evidentiary submissions and arguments of the parties."  *Cannon v. Hist. Design, Inc.*, No. 24 CIV. 7662 (JHR) (GWG), 2025 WL 2599889, at \*6 (S.D.N.Y. Sept. 9, 2025) (citations omitted).  Moreover, courts must exclude requested hours that are "excessive, redundant, or otherwise unnecessary."  *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983).  Upon finding that a party seeks compensation for excessive hours, a court has discretion "to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application."  *Rodriguez ex rel. Kelly v. Mcloughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999).  Here, a percentage cut of Defendants' requested hours is reasonable.  Plaintiffs correctly note that Defendants' submissions in support of their fee application do not neatly identify the total hours bill by each of Defendants' attorneys.  *See generally* Second Suppl. Perry Decl.  Indeed, in several entries Defendants engage in block billing. *See generally* Second Suppl. Perry Decl. at Ex. I, Ex. J.  Courts routinely find that

15

block billing "warrants some reduction in fees."[6] *See, e.g.*, *Al Thani v. Hanke*, 20 Civ. 4765 (JPC),

20 Civ. 8181 (JPC), 2025 WL 1591379, at *6 (S.D.N.Y. June 5, 2025) (collecting cases); *Vista*

*Outdoor Inc. v. Reeves Fam. Tr.*, No. 16 CIV. 5766, 2018 WL 3104631, at *7 (S.D.N.Y. May 24,

2018) ("Courts regularly apply percentage cuts where there is a substantial amount of block billing

in a fee request.") (citation omitted).  But most problematically, Defendants seek $191,083.05 for

drafting a little over 20 pages of substantive briefing and three supporting declarations—a three-

page single-spaced pre-motion letter [ECF No. 165], a seven and half-page Memorandum of Law

[ECF No. 174], a ten-page Reply, [ECF No. 189], and 6 pages of supporting declarations, [ECF

Nos. 175, 176, 190].  The caselaw cited in Defendants' pre-motion letter is largely regurgitated in

Defendants' subsequent Memorandum of Law and Reply.  And contrary to Defendants' suggestion,

the issues were neither terribly complex nor novel.  *See Arbor Hill Concerned Citizens*

*Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 184 (2d Cir. 2008) (noting district courts

may consider factors, including "the complexity and difficulty of the case" in determining a

reasonable fee award).  Moreover, having seven attorneys, including two partners, draft a fairly

straightforward motion is arguably excessive.

    Accordingly, the Court finds that a 40% aggregate reduction of the hours billed is

reasonable.  While the reduction is significant, it is in no way meant to impugn Defendants'

---

[6] Defendants explain that for mixed entries only a fraction of the work was considered to be incurred in connection with the sanctions-related motions.  Second Suppl. Perry Decl. at ¶¶ 5-6.  For example, if a mixed entry had four tasks and only one task was sanctions-related, the compensable fraction would be one-fourth.  *Id.*  According to Defendants*, the attorney responsible for the mixed entry would confirm if the assigned fraction was appropriate based on their best estimate, which meant some mixed entries might be "slightly under- or over-inclusive in certain respects."  *Id.* While Defendants' attempts at accuracy are not unreasonable, the mixed entries nonetheless "hamper[] the Court's ability to review the reasonableness of the fees requested" because the Court does not know what fraction was applied to which mixed entry based on Defendants' submissions.  *Al Thani*, 2025 WL 1591379 at *6.  Moreover, the mixed entries, in Defendants' own words, still pose the risk that their requested fees are "over-inclusive" thus warranting a reduction in fees.

counsel or their work.  Defendants are certainly entitled to seek high quality attorneys, who will expend considerable resources to secure favorable results for their clients.  However, the reasonableness of the fee award in this case is "not dictated by a particular client's subjective desires or tolerance for spending" but rather ought to reflect the fact that a reasonable client wishes to pay the "minimum necessary to litigate the case effectively." *Beijing Daddy's*, 2020 WL 729518, at *5 (reducing fee award to a large New York law firm by an aggregate of 30% to account in part for the fact that more hours may have been expended than necessary) (citation omitted).   The Court further concludes a 40% reduction is appropriate given the requested attorneys' fees are "more severe than reasonably necessary to deter repetition of the misconduct or comparable conduct by similarly situated persons." *See Usherson*, 2020 WL 3483661, at *21. Here, the Court is awarding a significant monetary sanction in the amount of $54,790.51 for expenses directly caused by Plaintiffs' vexatious and wanton conduct in this litigation—the $25,000 nonrefundable fee to PADRE and $29,790.51 in travel expenses for Plaintiffs executives.  An additional award of nearly $191,083.05 in attorneys' fees to recoup those costs would be more severe than appropriate to deter similar misconduct.  This is especially true because Plaintiffs' bad faith conduct in this instance does not reflect a pattern of vexatious behavior but rather is an isolated incident.

In sum, because the decision to impose a sanction "is truly discretionary," *Yukos Cap.*, 977 F.3d at 235, and that "the essential goal in shifting fees is to do rough justice, not to achieve auditing perfection," *Bandshell Artists*, 6 F.4th at 288 (quoting *Goodyear Tire & Rubber Co. v. Heager*, 581 U.S. 101, 110 (2017)), the Court concludes than an aggregate reduction of 40% of the requested attorneys' fees is appropriate resulting in an award of $114,649.83 of attorneys' fees.  Thus, the Court awards Defendants $169,440.34 in total—$114,649.83 in attorneys' fees

incurred in connection with the sanctions-related motions, $25,000 for the nonrefundable PADRE fee, and $29,790.51 of travel expenses incurred for the mediation.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for sanctions against Plaintiffs Zama Capital Advisors LP and Zama Capital Strategy Advisors LP is GRANTED IN PART and DENIED IN PART. Plaintiffs are ordered to pay $169,440.34 to Defendants for their bad faith conduct in cancelling a scheduled mediation at the eleventh hour.

The Clerk of court is respectfully requested to terminate docket entry 173.

**SO ORDERED.**

**Dated: December 9, 2025**
       **New York, New York**       **MARY KAY VYSKOCIL**
                                     **United States District Judge**